CITY OF GAYLORD v. GAYLORD CITY CLERK.

OPINION OF THE COURT.

1. APPEAL AND ERROR—CERTIFIED QUESTIONS.
   Attorneys who participate in proceeding to review action in circuit court by way of certified questions to the Supreme Court at request of the governor should address themselves to the questions *as certified.*

REFERENCES FOR POINTS IN HEADNOTES

[1] 5 Am Jur 2d, Appeal and Error § 1028.
[2] 50 Am Jur, Statutes §§ 165, 190.
[3] 50 Am Jur, Statutes § 162.
[4] 50 Am Jur, Statutes § 165.
[5] 50 Am Jur, Statutes §§ 165–168.
[6–8] 16 Am Jur 2d, Constitutional Law §§ 56, 227–229, 284, 285.
[9–12] 43 Am Jur, Public Securities and Obligations §§ 17, 18.
   42 Am Jur, Public Funds, § 6.
[13] 49 Am Jur, States, Territories and Dependencies §§ 28, 33.
   16 Am Jur 2d, Constitutional Law §§ 56, 167.
[14] 16 Am Jur 2d, Constitutional Law § 167.
[15] 49 Am Jur, States, Territories and Dependencies § 8.
   37 Am Jur, Municipal Corporations § 3.
   54 Am Jur, United States §§ 4, 5, 10.
[16–20] 37 Am Jur, Municipal Corporations § 120.
[21] 37 Am Jur, Municipal Corporations § 120.
   16 Am Jur 2d, Constitutional Law § 167.
[22] 16 Am Jur 2d, Constitutional Law §§ 64, 65.
[23] 51 Am Jur, Taxation §§ 39, 40, 53, 54, 56.
[24] 51 Am Jur, Taxation § 1010.
[25] 51 Am Jur, Taxation §§ 48, 49, 1010, 1014.
[26] 38 Am Jur, Municipal Corporations § 389.
   51 Am Jur, Taxation §§ 408–410.
[27, 28] 38 Am Jur, Municipal Corporations, §§ 458, 459.
   43 Am Jur, Public Securities and Obligations § 117.

2. STATUTES—TITLES—OBJECTS—CONSTRUCTION.

Constitutional provision that "no law shall embrace more than one object, which shall be expressed in its title", should be construed reasonably, and not in so narrow and technical a sense as unnecessarily to embarrass legislation (Const 1963, art 4, § 24).

3. SAME—INDUSTRIAL DEVELOPMENT REVENUE BOND ACT—OBJECT OF ACT.

The object of the industrial development revenue bond act is to enable municipalities to attract industry by acquiring and financing industrial facilities through revenue bonds (PA 1963, No 62).

4. SAME—VALIDITY OF TITLE—OBJECT.

The title of a legislative act, under the relevant constitutional provision, is good if it fairly indicates the general subject matter covered by the act (Const 1963, art 4, § 24).

---

REFERENCES FOR POINTS IN HEADNOTES

[29, 30] 43 Am Jur, Public Securities and Obligations §§ 117, 126, 130.
[31]. 50 Am Jur, Statutes § 471.
[32] 50 Am Jur, Statutes § 471.
  28 Am Jur, Initiative, Referendum and Recall § 5.
[33] 43 Am Jur, Public Securities and Obligations § 128.
[34] 37 Am Jur, Municipal Corporations § 210.
  43 Am Jur, Public Securities and Obligations § 128.
[35, 36] 43 Am Jur, Public Securities and Obligations §§ 117, 124.
[37–43] 43 Am Jur, Public Securities and Obligations §§ 117–130.
[44] 34 Am Jur, Mandamus § 125.
[45] 5 Am Jur 2d, Appeal and Error § 1009.
[46, 47, 51] 50 Am Jur, Statutes § 471.
  16 Am Jur 2d, Constitutional Law §§ 48, 49.
[48, 49] 16 Am Jur 2d, Constitutional Law §§ 48, 49, 258.
  50 Am Jur, Statutes §§ 467, 475, 488, 490, 496, 497.
[50] 50 Am Jur, Statutes §§ 217, 223, 467.
[52, 53] 50 Am Jur, Statutes § 471.
  16 Am Jur 2d, Constitutional Law § 177.
[54] 49 Am Jur, States, Territories and Dependencies § 28.
[55] 49 Am Jur, States, Territories and Dependencies §§ 28, 33.
[56] 16 Am Jur 2d, Constitutional Law §§ 181, 182.
[57] 16 Am Jur 2d, Constitutional Law §§ 179, 180.
[58] 16 Am Jur 2d, Constitutional Law § 101.
  50 Am Jur, Statutes § 219.
[59] 16 Am Jur 2d, Constitutional Law § 49.
[60] 20 Am Jur 2d, Courts §§ 64, 66.
[61] 16 Am Jur 2d, Constitutional Law §§ 101, 103.
[62, 63] 16 Am Jur 2d, Constitutional Law §§ 58, 59, 64, 87.
[64–66] 50 Am Jur, Statutes § 471.
  16 Am Jur 2d, Constitutional Law § 49.
[67] 5 Am Jur 2d, Appeal and Error §§ 1025–1028.

5. SAME—VALIDITY OF TITLE—INDUSTRIAL DEVELOPMENT REVENUE
BOND ACT—OBJECT EXPRESSED IN TITLE.
   Title of the industrial development revenue bond act *held*, suffi-
   cient under the relevant constitutional provision, since it fairly
   informs the reader of the object of the act (Const 1963, art 4,
   § 24; PA 1963, No 62).

6. CONSTITUTIONAL LAW—GOVERNMENTAL UNITS—INTERNAL IMPROVE-
MENTS.
   The constitutional provision that "The State shall not be a party
   to, nor interested in, any work or internal improvement" in-
   cludes both the State and the local units of government, since
   what the State cannot do itself cannot be done through the
   aid of inferior units of government (Const 1850, art 14, § 9;
   Const 1908, art 10, § 14; Const 1963, art 3, § 6).

7. SAME—INTERNAL IMPROVEMENTS—REVENUE BONDS.
   Constitutional prohibition to State being a party to or interested
   in works of internal improvements *held*, not to forbid statute
   authorizing issuance of bonds by municipalities to be paid
   back from rental of the industrial buildings contemplated to
   be constructed under the act, since the constitutional prohibi-
   tion does not include self-liquidating bonds which do not obli-
   gate the general taxing power (Const 1963, art 3, § 6; PA
   1963, No 62).

8. SAME—INTERNAL IMPROVEMENTS—REVENUE BONDS.
   Exception, as to self-liquidating revenue bonds, to the Constitu-
   tional prohibition against State involvement in internal im-
   provements, as construed under previous Constitution became
   part of present Constitution by retention of substantially the
   same language (Const 1850, art 14, § 9; Const 1908, art 10,
   § 14; Const 1963, art 3, § 6).

9. SAME—GRANT OF CREDIT—PUBLIC PURPOSE.
   Exception provided to Constitutional prohibition against grant
   by State of its credit to or in aid of any person or corporation
   is supplied by "any public purpose" as provided by law and
   therefore Supreme Court will only determine whether a revenue
   bond issue is a loan of credit for an unauthorized purpose
   (Const 1963, art 7, § 26, art 9, § 18).

10. MUNICIPAL CORPORATIONS—REVENUE BONDS—INTERNAL IMPROVE-
MENTS.
   Whether construction of an industrial plant through loan of
   proceeds of revenue bonds of municipal corporation is an in-
   ternal improvement barred by provision of Constitution bar-

ring loan of credit by State is not determined, where revenue bonds are determined not to be a loan of credit of the issuing municipality (Const 1963, art 7, § 26, art 9, § 18; PA 1963, No 62).

11. SAME—GRANT OF CREDIT—PUBLIC PURPOSES—SELF-LIQUIDATING BONDS.

Bonds issued under the industrial development revenue bond act *held,* not a loan of credit for an unauthorized purpose, since self-liquidating projects do not involve a granting of credit (Const 1963, art 7, § 26; PA 1963, No 62).

12. TAXATION—GRANT OF CREDIT—PUBLIC PURPOSE—REVENUE BONDS.

Contention of defendant city clerk that the issuance of bonds under the industrial development revenue bond act is an unauthorized loan of credit because negligence in issuance of bonds might cause the municipality to be held in breach of an implied covenant of warranty and breach of good faith, and that misrepresentation, implied covenant of warranty, and breach of trust are additional theories by which the general taxing powers of the municipality might be reached *held,* not valid, since these dangers exist as to all municipal revenue bonds of the State which are consistently deemed not to be pledges of the State's credit, and judicial precedent has created for the constitutional language a meaning that excludes revenue bonds from the definition of a loan of credit (Const 1963, art 7, § 26, art 9, § 18; PA 1963, No 62).

13. CONSTITUTIONAL LAW—STATE AND MUNICIPAL LEGISLATION—GOVERNMENTAL POWERS—PUBLIC PURPOSE—PUBLIC POLICY.

Theme of *public purpose* running through the present Constitution together with the traditional public policy of this State limits the powers of the legislature and of government generally to such legislative acts and such governmental powers as exhibit a public purpose (Const 1963, art 3, § 6, art 4, § 51, art 7, §§ 21, 26).

14. SAME—MUNICIPAL INDUSTRIAL AID—PUBLIC PURPOSE.

Municipal industrial aid financing has a public purpose.

15. STATUTES—ECONOMIC WELFARE—PUBLIC PURPOSE.

The consensus of modern legislative and judicial thinking is to broaden the scope of activities which may be classed as involving a *public purpose,* and it reaches its broadest extent under the view that the economic welfare is one of the main concerns of the city, State and Federal governments.

16. MUNICIPAL CORPORATIONS—WORDS AND PHRASES—PUBLIC PUR-
POSE.
    Determination of whether a municipal activity involves a public
    purpose may include a consideration of whether the benefit
    is available on equal terms to the entire public in the locality
    affected, and whether the service or commodity supplied is
    one needed by all or by a large number of the public, and
    whether the enterprise bears directly and immediately, or
    only remotely and circumstantially, upon the public welfare.

17. SAME—PUBLIC PURPOSE—GOVERNMENTAL OR PRIVATE ENTERPRISE.
    Determination of whether a municipal activity involves a public
    purpose may include a consideration of whether the need to
    be met in its nature requires united effort under unified
    control, or can be served as well by separate individual com-
    petition, and whether private enterprise has in the past failed
    or succeeded in supplying the want or in eradicating the evil.

18. SAME—CONSTRUCTION OF TERM "PUBLIC PURPOSE."
    A municipal public use changes with changing conditions of
    society, new appliances in the sciences, and other changes
    brought about by an increase in population and by new
    modes of transportation and communication.

19. SAME—PUBLIC PURPOSE.
    A municipal public purpose generally has for its objectives
    the promotion of the public health, safety, morals, general
    welfare, security, prosperity, and contentment of all the in-
    habitants or residents within the area.

20. WORDS AND PHRASES—TEST OF "PUBLIC USE."
    The test of *public use* is not based upon the function or capacity
    in which or by which the use is furnished but upon the right
    of the public to receive and enjoy the benefit of the use.

21. MUNICIPAL CORPORATIONS—INDUSTRIAL DEVELOPMENT REVENUE
BONDS—CONSTITUTIONAL LAW.
    Industrial development revenue bond act authorizing certain
    municipalities to issue tax-exempt revenue bonds for the
    indicated purpose *held*, constitutional, since it exhibits a public
    purpose, it being a determination of the legislature that
    the public health and welfare will be served thereby especially
    in view of requirement of Constitution that laws concerning
    municipal corporations be liberally construed in their favor
    (Const 1963, art 7, § 34; PA 1963, No 62).

22. CONSTITUTIONAL LAW—MUNICIPAL CORPORATIONS.

Supreme Court takes particular note of the new mandate in the new Constitution that "the provisions of this Constitution and laws concerning counties, townships, cities and villages shall be liberally construed in their favor" in passing on the constitutionality of act authorizing them to issue industrial development revenue bonds (Const 1963, art 7, § 34; PA 1963, No 62).

23. TAXATION—LIENS.

A lien is not an essential element of the power of taxation.

24. SAME—LIEN ON PROPERTY—STATUTES.

Taxes do not constitute a lien on property unless taxing statute expressly so provides.

25. SAME—TAX LIEN—SURRENDER OF TAXING POWER—CONSTITU-TIONAL LAW—STATUTES.

Contention of defendant that the industrial development revenue bond act violates the constitutional provision prohibiting the surrender, suspension, or contracting away of the power of taxation as the act provides that the lessee of the industrial property will be subject to *ad valorem* property taxation, but that a lien will not attach to the property by virtue of that tax, *held*, not well taken, since a lien is not an essential element of the power of taxation, and taxes do not constitute a lien on property unless a taxing statute expressly so provides (Const 1963, art 9, § 2; PA 1963, No 62).

26. SAME—LEASED PROPERTY—PURPOSE OF TAXING STATUTES—PROFIT-MAKING VENTURES.

Purpose of provision of the industrial development revenue bond act that lessees of municipally-owned property be subject to *ad valorem* property taxation, is to insure that persons leasing normally tax-exempt property for profit-making purposes do not secure an unfair advantage by avoiding taxation (PA 1963, No 62, § 11).

27. STATUTES—CONSTITUTIONAL LAW—LIMITATIONS ON POWER OF CITIES TO BORROW—SELF-LIQUIDATING BONDS.

Statute authorizing city to issue tax-exempt municipal bonds to finance acquisition of industrial plant, and which contains no restriction on the power of the city to borrow *held*, constitutional, notwithstanding absence of restriction, where the bonds are self-liquidating revenue bonds, not payable by the city or by taxation, and not constituting a debt within the debt-limit provision of the Constitution (Const 1963, art 7, § 21; PA 1963, No 62).

28. BONDS—MUNICIPAL CORPORATIONS—PUBLIC SALE.

Statute authorizing city to issue tax-exempt municipal industrial development revenue bonds but silent with regard to the manner in which bonds are to be sold despite provision of the municipal finance act for the public sale of mortgage revenue bonds issued by any municipality *held,* valid, since the legislature may determine whether it wishes to place restrictions on the manner in which bonds are to be sold and the act does not require public sale (CLS 1961, § 133.2; PA 1963, No 62).

29. SAME—PURPOSE OF PUBLIC SALE—MUNICIPAL BONDS.

The normal purpose of a public sale of municipal bonds is to assure the best price.

30. SAME—PUBLIC SALE—MUNICIPAL BONDS.

Statute authorizing city to issue tax-exempt municipal industrial development revenue bonds but not requiring public sale of said bonds *held,* reasonable, because the city is not concerned with the price at which the bonds are sold, since it will receive no benefit from a higher price, the price being of concern only to the lessee corporation (PA 1963, No 62).

31. STATUTES—INDUSTRIAL DEVELOPMENT REVENUE BONDS—MUNIC- IPAL FINANCE COMMISSION—MUNICIPAL FINANCE ACT.

Statute authorizing city to issue tax-exempt municipal industrial development revenue bonds and which requires the municipal finance commission to determine "whether the bonds conform to the provisions of this act", *held,* not deficient in not providing for public sale of said bonds, since, while the bonds under the act may not be issued without the approval of the municipal finance commission, they are not subject to the provisions of the municipal finance act (CLS 1961, § 133.2; PA 1963, No 62).

32. SAME—REFERENDUM—MUNICIPAL BOND ISSUE—NOTICE.

Statute which authorizes city to issue municipal industrial development revenue bonds *held,* not to be invalid merely because it provided for a right of referendum but contained no provision as to how notice should be given to the electors of that right, where the legislature is not required to provide *any* right of referendum (PA 1963, No 62, § 12).

33. MUNICIPAL CORPORATIONS—REFERENDUM—BOND ISSUE—NOTICE —PUBLICATION.

No abuse of discretion is shown in giving notice to the electorate where city council's action in authorizing a bond issue was

published in the local newspaper, and no petition for referendum was filed, since the statute is silent as to how notice must be given (PA 1963, No 62, § 12).

34. Same—Industrial Development Revenue Bond Act—Home-Rule Act—Referendum.

Only the referendum provision contained in industrial development revenue bond act, which is silent as to how notice is to be given to electors, is applicable to bond issue thereunder, since the referendum provision contained in the home-rule act, requiring notice by publication 30 days prior to adoption, is substantially different (CLS 1961, § 117.5[g]; PA 1963, No 62, § 12).

35. Same—Statutes—Depreciation.

Contention of defendant that the proposed industrial development revenue bond issue conflicts with the authorizing statute because it fails to create a specific depreciation account *held*, without merit, since the rentals will completely amortize the cost of the plant over the period of the lease, an adequate built-in "depreciation account" being provided therein (PA 1963, No 62, § 3[c]).

36. Same—Operation and Maintenance Fund.

Proposed industrial development revenue bond issue which makes no provision for operation and maintenance fund and under which excess fees are returned to lessee *held*, not in conflict with the authorizing statute provision concerning establishment of such an account, where lessee agreed to pay for operation and maintenance, since rentals need not include this cost, there will be no sums to be segregated into such a fund (PA 1963, No 62, § 3[c]).

37. Same—Operation and Maintenance Fund—Depreciation Account.

Failure of proposed industrial development revenue bond issue to provide for operation and maintenance fund *held*, not in conflict with provision of authorizing statute providing for transfers of surplus funds from the operating and maintenance fund to the depreciation fund, where the statutory provision is permissive only, and does not require such a transfer (PA 1963, No 62, § 8[1]).

38. Same—Trustee—Mortgage.

Proposed industrial development revenue bond issue which calls for naming of a trustee and does not provide for a mortgage on the facility *held*, not in conflict with the authorizing statute,

where pertinent section recognizes the alternative of either a mortgage or a trustee for the bondholders, and the section is permissive and provides only that the resolution authorizing the bond issue "may [require] a mortgage or deed of trust" to secure the principal and interest of the bonds (PA 1963, No 62, § 5).

39. SAME—BOND ISSUE—EXISTING BUILDING—COMPETITIVE BIDDING —CHARTER PROVISION.

Proposed industrial development revenue bond issue which fails to provide for competitive bids *held*, not to violate the city charter provision requiring competitive bids before making a purchase or contract for supplies, materials, equipment or contractual services, since the industrial building is now in existence, and industrial development revenue bond act authorizing the issue allows a municipality to acquire an industrial facility by "gift or purchase" (PA 1963, No 62, § 3[a]; Gaylord City Charter, § 16.6).

40. SAME—BOND ISSUE—CHARTER PROVISION—APPROVAL OF ELECTORS.

Proposed industrial development revenue bond issue does not violate provision of city charter requiring city to have electorate approval before engaging in a business enterprise requiring an investment or money in excess of 10 cents per capita, since the city's function, merely to furnish its name to a revenue bond issue, does not constitute engaging in a business enterprise (PA 1963, No 62; Gaylord City Charter, § 15.2).

41. SAME—MUNICIPAL FUNDS—LEASE RENTALS—CONFLICT WITH STATUTES.

Provision of city charter requiring all funds accruing to the city to be paid to the city clerk was designed for the normal fiscal activities of the city, conflicting with provision of the act authorizing industrial development revenue bond issue which permits a city to covenant as to the use and disposition of rentals from the industrial building which was intended to provide a particular means for the collection and payment of funds involved in industrial financing, and is not applicable to the bond issue (PA 1963, No 62, § 5[1][a]; Gaylord City Charter, § 10.7).

42. SAME—CHARTER—CLAIMS AND DEMANDS.

City charter provision of a precise method by which claims and demands against the city are to be met does not invalidate proposed industrial development revenue bond issue, where

the bond issue is self-liquidating and no *claims and demands* will arise from proposed scheme of financing (PA 1963, No 62; Gaylord City Charter, § 10.9).

43. SAME—CHARTER PROVISION—MUNICIPAL INDEBTEDNESS.

Provision of city charter which prohibits any indebtedness in excess of 10% of assessed valuation of all property in city *held,* not to invalidate proposed industrial development revenue bond issue, since the indebtedness contemplated by the charter is general obligation indebtedness and not self-liquidating indebtedness (PA 1963, No 62; Gaylord City Charter).

44. MANDAMUS—CERTIFIED QUESTION—INDUSTRIAL DEVELOPMENT REVENUE BONDS—CITY CLERK.

Mandamus will issue in action by city to require defendant city clerk to perform her function to validate a proposed industrial development revenue bond issue in accordance with city council resolution, where the questions raised by defendant as to the validity and constitutionality of the act authorizing the proposed bond issue were certified to Supreme Court in leave granted after request by the Governor and all such questions have been answered favorably to the plaintiff (PA 1963, No 62; GCR 1963, 797).

45. COSTS—PUBLIC QUESTION—VALIDITY OF BONDS.

No costs are allowed in case to determine validity of industrial development revenue bonds to be issued to finance acquisition of industrial buildings, a public question being involved (PA 1963, No 62).

ADDENDUM.

O'HARA and ADAMS, JJ.

46. STATUTES—TEST OF CONSTITUTIONALITY.

*Correct test of constitutionality of a statute is its validity under the present Constitution, and the statute need not be tested against a previous Constitution in effect at the time of its enactment (Const 1963, art 3, § 7; sched § 2).*

47. SAME—CONSTITUTIONALITY.

*All laws that were in force and effect when present Constitution became effective were validated by the Constitution, and the constitutionality of such laws is to be tested by the existing Constitution save as to existing public and private rights as provided by the schedule 'and temporary provisions (Const 1963, art 3, § 7; sched § 2).*

SEPARATE OPINION.

T. M. KAVANAGH, C. J., and DETHMERS,
KELLY, and SMITH, JJ.

48. CONSTITUTIONAL LAW—STATUTES—POWER OF LEGISLATURE.

*Legislature may enact a statute in anticipation of a constitu-*
*tional amendment authorizing it or provide that it shall take*
*effect upon the adoption of such a constitutional amendment.*

49. SAME—STATUTES—POWER    OF    LEGISLATURE—CONSTITUTIONAL
TEST.

*Legislature may pass an act to take effect only upon the adop-*
*tion of a constitutional provision authorizing it, and its*
*constitutionality is to be tested by the Constitution as it is*
*at the time the law takes effect, and not as when it was*
*passed (Const 1963, art 3, § 7; PA 1963, No 62).*

DISSENTING OPINION.

SOURIS, J.

50. STATUTES—INDUSTRIAL DEVELOPMENT REVENUE BOND ACT—
EFFECT OF ACT—TAX EXEMPTION—FAVORED PRIVATE ENTERPRISE.

*Practical effect of industrial development revenue bond act is*
*to authorize municipalities to grant favored private enter-*
*prises the benefit of the Federal tax exemption status of inter-*
*est on municipal bonds for the purpose of financing industrial*
*development at costs less than the private financial market*
*would charge (PA 1963, No 62; 26 USCA, § 103[a][1]).*

51. SAME—VALIDITY—CONSTITUTION IN EFFECT AT TIME OF ADOP-
TION.

*Constitutional validity of a statute must be judged by the limita-*
*tions contained in the constitutional charter in effect when the*
*statute was adopted.*

52. SAME—EFFECT OF VOID STATUTE—SUBSEQUENT CHANGE IN CON-
STITUTION.

*A statute or charter in conflict with Constitution is null and void*
*and of no force, and such a law or charter cannot become valid*
*merely through a change in the Constitution and the lapse*
*of time.*

53. CONSTITUTIONAL LAW—POWER OF LEGISLATURE—VOID STATUTE—
EFFECT OF NEW CONSTITUTION.

*An enactment by the legislature in disregard of prohibition in the*
*Constitution at time of enactment is utterly void, and power*
*subsequently conferred upon the legislature by new Constitu-*

tion does not have a retroactive effect, and does not give
validity to such void law.

54. STATUTES—CONSTITUTIONALITY.

Legislative acts must be judged in the light of the powers
possessed by the legislature at the time it undertakes to act.

55. CONSTITUTIONAL LAW—POWERS OF LEGISLATURE—POWERS OF CON-
GRESS.

Legislative power of a State, unlike legislative power of con-
gress, does not depend upon express constitutional grant, but,
rather, is as broad and comprehensive as necessary to accom-
plish the legitimate purposes of government except as the
people may have imposed restraints upon such power by con-
stitutional limitations.

56. STATUTES—VOID IN CERTAIN CIRCUMSTANCES—CONTINUED VALID-
ITY.

A legislative enactment which is declared unconstitutional as
applied to certain parties or certain acts, but otherwise within
the power of the legislative body to enact, is generally held,
to be void only when so applied and otherwise is given legal
effect.

57. SAME—VALIDATION OF VOID STATUTE BY CONSTITUTIONAL ENACT-
MENT.

The people, by express constitutional enactment or by necessary
implication therefrom, can validate a prior legislative enactment
which exceeded the legislature's constitutional power at time
it adopted the act.

58. CONSTITUTIONAL LAW—FUNCTION OF JUDICIARY—INTENT OF PEO-
PLE.

It is the judiciary's function in interpreting constitutional lan-
guage to find the intent of the people who adopted it by their
votes.

59. SAME—SAVING CLAUSE.

Provision of Constitution continuing laws in force at time Con-
stitution became effective is a saving clause which continues
in force and effect under the new Constitution previously en-
acted statutes which were in force validly under the preceding
Constitution so long as not repugnant to the new Constitution
(Const 1963, art 3, § 7).

60. COURTS—SUPREME COURT—STRATAGEMS OF LITIGANTS.

The Supreme Court may not be restricted artificially by tactical
stratagems of litigants in the performance of its duty when
constitutional issues of public importance are involved.

61. ACTION—COURT RULE—CONSTITUTIONAL LAW.

*A proceeding under court rule to determine constitutionality of industrial development revenue bond act before judgment in trial court should be remanded for a complete testimonial hearing in trial court, where the case is before the Supreme Court prematurely, briefs of counsel do not address themselves to constitutional issues of threshold importance, and the proceeding undertakes to validate in advance a proposed bond issue by opinion it should be bond counsel's obligation to write (PA 1963, No 62; GCR 1963, 797).*

62. COURTS—CONSTRUCTION OF CONSTITUTION.

*Cases decided after a provision of a Constitution is adopted may not be used in determining what the delegates and the people intended in adopting such provision.*

63. SAME—CONSTRUCTION OF FORMER CONSTITUTION.

*Principles declared in cases construing provisions of a former Constitution may properly be reconsidered in subsequent cases involving construction of such Constitution, whereas such reconsideration might not be indulged properly when construing similar provisions of new Constitution adopted in the light of such former decisions.*

DISSENTING OPINION.

BLACK, J.

64. STATUTES—VALIDITY.

*Validity of a statute should be determined as of the date of adoption.*

65. SAME—VALIDITY—ADOPTION—REPUGNANCY.

*A statute which is constitutional as of the time it became effective would then be subject to determination as to repugnancy under subsequently adopted provisions of the Constitution (Const 1963, art 3, § 7).*

66. SAME—CONSTITUTIONAL LAW—VALIDATION.

*A statute which was unconstitutional when adopted is not validated by the adoption of a Constitution setting forth that "laws now in force, not repugnant to this constitution, shall remain in force," since such was not the intent of the provision, it being necessary that a law be "in force" to be continued and an unconstitutional act is no law from the beginning (Const 1963, art 3, § 7).*

67. APPEAL AND ERROR—CERTIFIED QUESTIONS—AMENDMENT.
 Amendment of pleadings and certification of additional questions should be directed, where questions certified at request of the governor are insufficient (GCR 1963, 797).

Questions certified from Otsego; O'Keefe (Dennis J.), J. Submitted April 6, 1966. (Calendar No. 1, Docket No. 51,239.) Decided August 24, 1966.

Complaint by City of Gaylord for a writ of mandamus to compel Gladys Beckett, Gaylord City Clerk, to comply with directions of Gaylord City Council, directing her to execute and certify an agreement under the industrial development revenue bond act of 1963. The Attorney General, Frank J. Kelley, intervened in the cause, and the Governor, George Romney, requested that certain questions in the case be certified to the Supreme Court as permitted by GCR 1963, 797. Request granted and questions certified by the trial judge to this Court. Questions answered favorably to plaintiff and writ of mandamus ordered granted.

*Boyd C. Baird,* Gaylord City Attorney, (*Miller, Canfield, Paddock & Stone,* of counsel), for plaintiff.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *Eugene Krasicky* and *James J. Wood,* Assistant Attorneys General, for the State of Michigan, intervenor.

*Walsh & O'Rourke* (*Daniel F. Walsh,* of counsel), for defendant.

ADAMS, J. On May 8, 1963, the legislature enacted PA 1963, No 62 (CL 1948, § 125.1251 *et seq.* [Stat Ann 1965 Cum Supp § 5.3533(21) *et seq.*]), de-

scribed as the "industrial development revenue bond act of 1963." It permits Michigan municipalities to issue tax-exempt municipal bonds to finance acquisition of industrial buildings.

The city council of Gaylord approved such a bond issue. It contracted with United States Plywood Corporation for it to purchase land and construct an industrial plant. Gaylord is to finance purchase of these facilities by selling "city of Gaylord, Michigan, industrial building revenue bonds." The facilities are then to be sold to the city with a lease back to the corporation for 25 years at a rental sufficient to pay principal and interest on the bonds. At the end of 25 years, the corporation has the option of purchasing the facilities for $1. The bonds are to recite:

"This bond and the interest thereon are payable solely from the revenues derived from the facilities * * * and does not [in any way] * * * obligate * * * the city to levy * * * any form of taxation whatever for the payment of such principal and interest."

Because section 103 of the internal revenue code of 1954 (26 USCA, § 103[a][1]) grants a tax exemption to the income from municipal bonds, the net result of this transaction is that the city of Gaylord lends its tax-free status to the corporation so that the interest on what would otherwise be a private bond issue becomes tax-free.

The plywood plant has been built, but defendant city clerk refused to complete the transaction. The city brought mandamus to compel performance. The case was certified directly to this Court, by virtue of GCR 1963, 797, at the request of Governor George Romney. The questions are stated in this opinion as certified to us by the circuit judge.[1]

---

[1] The questions were not so presented or briefed by either party, a practice of which we disapprove. Wherever this unusual procedure

I.

Is Act 62 of 1963 unconstitutional because its title is deficient under the terms of article 4, § 24, of the Michigan Constitution (1963)?

Defendant contends that Act No 62 violates article 4, § 24, of the Michigan Constitution of 1963, which provides:

"No law shall embrace more than one object, which shall be expressed in its title."

Justice Thomas M. Cooley has stated the principle to be followed in applying this section:

"It ought to be construed reasonably, and not in so narrow and technical a sense as unnecessarily to embarrass legislation." *Ryerson* v. *Utley,* 16 Mich 269, 277, citing *People, ex rel. Drake,* v. *Mahaney,* 13 Mich 481, 494.

The object of Act No 62 is to enable municipalities to attract industry by acquiring and financing industrial facilities through revenue bonds. The title reads:

"An act relating to industrial development; to authorize municipalities to acquire industrial buildings and sites; to provide for the financing of such buildings by the issuance of revenue bonds; to provide the terms and conditions of such bonds; and to prescribe the powers and duties of the municipal finance commission."

The title informs the reader of the object of the act. "The title to an act is good if it fairly indicates the general subject matter covered by the act." *City of Bay City* v. *State Board of Tax Administration,* 292 Mich 241, 249.

is invoked, the parties should address themselves to the questions as certified.

## II.

Are the improvements for which bonds are to be issued works of internal improvement for private purposes prohibited by article 3, § 6, of the Michigan Constitution (1963)?

Article 3, § 6, of the Michigan Constitution (1963) provides:

"The State shall not be a party to, nor be financially interested in, any work of internal improvement, nor engage in carrying on any such work, except for public internal improvements provided by law."

The reasons for section 6 have been fully documented.[2] Briefly, in 1835 the people of Michigan sought a prosperity they thought could be brought about by improved lines of communication. They directed the legislature to engage in "Internal improvement * * * in relation to roads, canals and navigable waters." Constitution of 1835, art 12, § 3. Shortly afterward, the nation underwent a financial crisis. Oppressive taxation to service the State debt resulted from many bond issues that had been floated to finance "internal improvements." Article 14, § 9, of the Constitution of 1850 provided:

"The State[3] shall not be a party to, nor interested in, any work or internal improvement."

This prohibition, with modifications in language, was carried into the 1908 and 1963 Constitutions.

[2] See *Attorney General, ex rel. Barbour,* v. *Pingree,* 120 Mich 550, 554 *et seq.* (46 LRA 407); Campbell, Outlines of the Political History of Michigan, p 480 *et seq.* (1876); Cooley, Michigan, a History of Governments, p 279 *et seq.* (1905); Sagendorph, Stevens Thomson Mason, Misunderstood Patriot, p 317 *et seq.* (1947).

[3] This language includes both the State and local units of government. *Attorney General, ex rel. Barbour,* v. *Pingree, supra,* p 561. Also, see 2 Proceedings of the 1907–1908 Constitutional Convention, pp 1066, 1067; 2 Official Record, Constitutional Convention of 1961, p 2310.

Const 1908, art 10, § 14; Const 1963, art 3, § 6. It has been repeatedly held, however, that it does not include self-liquidating bonds because they do not obligate the general taxing power. *Gilbert* v. *City of Traverse City,* 267 Mich 257, 260, 261; *Attorney General, ex rel. Eaves,* v. *State Bridge Commission,* 277 Mich 373, 383; *Oakland County Drain Com'r* v. *City of Royal Oak,* 306 Mich 124, 142; *City of Dearborn* v. *Michigan Turnpike Authority,* 344 Mich 37, 74, 75.

The law of these cases was brought to the attention of the delegates to the 1961 convention by a member of the committee that drafted section 6. He stated:

"Neither the State nor any local unit of government is prohibited by section 14 of article 10 [1908 Constitution] from engaging in self-liquidating projects. These projects, of course, are defined, generally speaking, as projects which must be paid for out of the revenue which the project itself produces, such as is established by revenue bond that I am sure practically all of the delegates in this convention are familiar with. This section, of course, does not prohibit engaging in that type of activity." 2 Official Record, Constitutional Convention of 1961, p 2311.

A sponsor of a minority amendment which later was substantially adopted by the convention as section 6 stated:

"Now, let us look upon its operation [article 10, § 14 (1908 Const)] as a prohibition against government ventures in, hopefully, self-supporting and self-liquidating projects. One, it is no longer very effective in this direction." 2 Official Record, *supra,* p 2317.

Whether the exception as to revenue bonds was approved or disapproved, it was a recognized fact.

The delegates froze that exception into section 6 by their retention of substantially the same language which, in prior Constitutions, had been construed to allow it.  See Const 1850, art 14, § 9; Const 1908, art 10, § 14.

Defendant insists that we look at the plain language of the Constitution.  It prohibits not only direct financial involvement by the State but also prohibits the State from being a "party" to works of internal improvement.  The State, through the city of Gaylord, is a "party" but the prohibition against the State being a "party" was present when this Court found an exception as to self-liquidating bonds.  Const 1850, art 14, § 9; Const 1908, art 10, § 14.  Since that exception was known to the delegates, in the absence of some specific limitation by them of the same, it must be considered still valid.

This project might also escape classification as an internal improvement as not being an artery of commerce.  See OAG 1963–1964, pp 75–78.  Whether the meaning of "internal improvement" should be so limited need not be decided in light of our holding as to self-liquidating bonds.

### III.

Will the issuance of bonds under Act 62 of 1963 constitute the granting of the credit of the city of Gaylord, an agency of the State, for unauthorized purposes as prohibited by article 9, § 18, and article 7, § 26, of the Michigan Constitution (1963)?

Article 9, § 18, of the 1963 Constitution provides:

"The credit of the State shall not be granted to, nor in aid of any person, association or corporation, public or private, *except as authorized in this Constitution.*"   (Emphasis supplied.)

Article 7, § 26 (Const 1963), provides:

"Except as otherwise provided in this Constitution, no city or village shall have the power to loan its credit for any private purpose or, *except as provided by law,* for any public purpose." (Emphasis supplied.)

An exception permitted by section 18[4] is contained in section 26. We confine our inquiry to section 26. Defendant admits that this Court has, on several occasions, held that self-liquidating projects do not involve a granting of credit. *Attorney General, ex rel. Eaves,* v. *State Bridge Commission, supra; Oakland County Drain Com'r* v. *City of Royal Oak, supra.* She seeks to delimit this line of cases, however, by pointing out that each involved a clear, undisputed public purpose. Under section 26, if the bond issue is not a loan of credit, the question of public purpose is not reached.

· Defendant cites the banking laws of Connecticut, Massachusetts, and New York[5] to the effect that *any* default by a municipality for a fixed period of years preceding a bond issue shall bar banks and financial institutions in those States from buying the general obligation bonds of that municipality. Defendant also contends that if the municipality is negligent in issuing the bonds it may·be held in breach of an implied covenant of good faith (see Armstrong, "Municipal Inducements"—The New Mexico Commercial and Industrial Project Revenue Bond Act, 48 Cal

---

[4] Section 18 places a flat prohibition upon the lending of credit "except as authorized in this Constitution." The predecessor of section 18, article 10, § 12, of the Constitution of 1908, did not contain this exception. Because of this, decisions involving municipalities under the 1908 Constitution relied upon both article 10, § 12, and article 8, § 25, which was directly applicable to local units of government. *Skutt* v. *City of Grand Rapids,* 275 Mich 258, 266; *Sommers* v. *City of Flint,* 355 Mich 655, 661. Under the 1963 Constitution, this is no longer required.

[5] CGSA, §§ 36-96(2); Ann L Mass., ch 168, § 43; 4 McKinney's Cons. L., Banking Law, § 235.

L Rev 58, 62, n 19 [1960]) and that misrepresentation, implied covenant of warranty, and breach of trust are additional theories by which the general taxing power of the municipality might be reached.[6] (See Fordham, Revenue Bond Sanctions, 42 Col L Rev 395, 409–419 [1942].; The "Public Purpose" of Municipal Financing for Industrial Development, 70 Yale L Rev 789, 793 [1961].)

The dangers presented by these various contentions exist as to all municipal revenue bonds, not just industrial revenue bonds.[7] However persuasive defendant's arguments might be upon first impression, if we were to characterize industrial revenue bonds as a loan of credit, such a holding would have to extend to all types of revenue bonds. The delegates to the 1961 Constitutional Convention brought the lending of credit provision into the 1963 Constitution against a line of decisions which flatly stated that revenue bonds are not within the prohibition of lending of credit. See *Attorney General, ex rel. Eaves, v. State Bridge Commission, supra; Oakland County Drain Com'r v. City of Royal Oak, supra;*

---

[6] The proposed lease between Gaylord and United States Plywood places the sole burden of tort liability, insurance, and repair on the lessee corporation. A trustee will attend to the mechanics of collection of rent, segregation of funds, and payment of the bonds. However, in the proposed trust indenture the city will covenant to perform all duties placed upon it and agree to collect sufficient revenues and rental income to meet the requirements of the indenture. Numerous other duties are placed upon the city, such as enforcing compliance with the terms of the lease and reletting the facilities in the event of default by United States Plywood. Safeguards are provided by section 13 of PA 1963, No 62, which require the municipality to obtain permission from the municipal finance commission for the bond issue. The commission may request information from the municipality and section 13 lays down specific criteria to guide the commission in giving its approval. See CL 1948, § 125.1263 (Stat Ann 1965 Cum Supp § 5.3533[33]).

[7] Similarly, these dangers are encountered by revenue bonds issued by the State but nevertheless the bonds have been regularly held not to be pledges of the State's credit. See the recent case of *Schureman v. State Highway Commissioner,* 377 Mich 609, 611; Pinsky, State Constitutional Limitations on Public Industrial Financing: An Historical and Economic Approach, 111 Penn L Rev 265, 316.

*City of Dearborn* v. *Michigan Turnpike Authority, supra,* p 59. These decisions have created for the constitutional language a meaning that excludes revenue bonds from the definition of a loan of credit.

## IV.

Does the financing proposed leave open the possibility that tax moneys of the city may be diverted for nonpublic purposes as prohibited by article 7, § 21, of the Michigan Constitution (1963)?

We would state the above question as follows: Does Act No 62 and the program of the city of Gaylord thereunder exhibit a public purpose? It is the crucial question in this case and one of first impression. Unlike the questions thus far discussed, it is not possible to point to a specific provision of the 1963 Constitution that might be construed to permit the city of Gaylord to act if a public purpose is present or to prohibit it from acting absent such purpose.

Nevertheless, the theme of public purpose runs through the Constitution. As we have seen, article 3, § 6, specifically excepts from its prohibitions "public internal improvements provided by law", and article 7, § 26, prohibits the lending of the credit of any city or village "except as provided by law, for any public purpose."

Article 7, § 21, reads:

"The legislature shall provide by general laws for the incorporation of cities and villages. Such laws shall limit their rate of ad valorem property taxation for municipal purposes, and restrict the powers of cities and villages to borrow money and contract debts. Each city and village is granted power to levy other taxes for public purposes, subject to limitations and prohibitions provided by this Constitution or by law."

Article 4, § 51 (Const 1963), provides:

"The public health and general welfare of the
people of the State are hereby declared to be matters
of primary public concern. The legislature shall
pass suitable laws for the protection and promotion
of the public health."

This new section, together with the traditional
public policy of this State, must be held to limit the
powers of the legislature and of government general-
ly to such legislative acts and such governmental
powers as exhibit a public purpose.[8]

Defendant contends that the location of a manu-
facturing plant in the Gaylord area is not a public
purpose because the plant is primarily to make a
profit for its stockholders; that any benefit the area
receives is merely incidental; that such a plant will
create additional public needs for schools, streets,
sewers, and water facilities which will increase the

---

[8] The absolute character of this requirement does not diminish its
flexibility. As Justice COOLEY said, "All governmental powers exist
for public purposes, but they are not necessarily to be exercised
under the same conditions of public interest. The sovereign police
power which the State possesses is to be exercised only for the
general public welfare, but it reaches to every person, to every
kind of business, to every species of property within the common-
wealth. The conduct of every individual and the use of all prop-
erty and of all rights is regulated by it, to any extent found necessary
for the preservation of the public order, and also for the protection
of the private rights of one individual against encroachments by
others. The sovereign power of taxation is employed in a great
many cases where the power of eminent domain might be made more
immediately efficient and available, if constitutional principles would
suffer it to be resorted to; but each of these powers has its own
peculiar and appropriate sphere, and the object which is *public* for
the demands of one is not necessarily of a character to permit the
exercise of another." *People, ex rel. Detroit & H. R. Co.,* v. *Township
Board of Salem,* 20 Mich 452, 478 (4 Am Rep 400). The require-
ment of public purpose has been most rigid when public money or
property is involved. *Attorney General* v. *Board of Supervisors of
Bay County,* 34 Mich 46, 47; *Baker* v. *City of Grand Rapids,* 142
Mich 687, 690; *Younglas* v. *City of Flint,* 345 Mich 576, 578; *Cf.
Sommers* v. *City of Flint, supra.* The requirement has been less
rigid when there was no chance the general taxing power could be
reached. *Gilbert* v. *City of Traverse City,* 267 Mich 257, 261.

tax burden; and that, if the plant shuts down, the public welfare load would be substantially increased.

Plaintiff contends that there is a definite public interest in providing and maintaining steady employment; that under the stipulated facts, as a direct result of the location of the plywood plant in the Gaylord area, there is now only one vacant building on Main street out of 14 vacant not long ago; that it is extremely difficult to rent store space; that a housing shortage exists; commercial and residential growth has resulted; the corporation will employ up to 200 persons in the plant and an additional 100 or 150 persons in outside activity.

It is further stipulated that, based upon the United States Chamber of Commerce estimate prepared for the small business administration, the expected impact of the manufacturing plant on the economy of the city of Gaylord is reflected in the following chart:

"CHART

"What Each 100 Jobs Means to a Community.
"What 100 New Factory Workers Bring to a Town:
          "359 More People
           "91 More School Children
"$710,000 More Personal Income Per Year
      "100 More Households
"$229,000 More Bank Deposits
            "3 More Retail Establishments
           "97 More Passenger Cars Registered
           "65 More Employed in Nonmanufacturing
"$331,000 More Retail Sales Per Year."

Whether the rosy picture of the future depicted by plaintiff may prove to be a chimera or reality, this Court can neither judge nor prognosticate. There is nothing in the contract between United States Plywood and the city of Gaylord to guarantee either result. Plywood is not obligated to provide

any given number of jobs for any period of time. It does not undertake to run the plant a single day. If, because of technological advances or for any other reason, it should elect to close the plant, there is nothing in its contract to prevent it from doing so.  Nevertheless it is Plywood's money alone that was laid on the line to construct this plant and it would seem to be a reasonable assumption that operation of it will follow.

As we have noted, insofar as Plywood is concerned, it achieves by this transaction a tax-exempt status for interest on bonds issued in the name of the city which Plywood alone is in effect obligated to redeem.  Gaylord was assured only that a manufacturing plant would be built in a township adjacent to the city and that the rental for the plant would pay off the bonds.

In casting up the credits and the debits, from present view, the probabilities would seem to favor the credits—that is to say, employment and other benefits to the community and the area as opposed to additional costs for schools, public utilities, and the hazard of unemployment.  Such an assessment is buttressed by the fact that the transaction is subject to the scrutiny and approval of the Michigan municipal finance commission.

Numerous cases from other jurisdictions deal with the problem of public purpose.  The weight of authority[9] upholds municipal industrial aid financing

---

[9] *Opinion of the Justices, No. 120,* 254 Ala 506 (49 So 2d 175); *Newberry* v. *City of Andalusia,* 257 Ala 49 (57 So 2d 629); *DeArmond* v. *Alaska State Development Corporation* (Alaska), 376 P2d 717; *Andres* v. *First Arkansas Development Finance Corp.,* 230 Ark 594 (324 SW2d 97); *Hackler* v. *Baker,* 233 Ark 690 (346 SW2d 677); *Roan* v. *Connecticut Industrial Building Commission,* 150 Conn 333 (189 A2d 399); *In re Opinion of the Justices,* 54 Del 366 (177 A2d 205); *State, ex rel. Ferguson,* v. *City of Pittsburg,* 188 Kan 612 (364 P2d 71); *Industrial Development Authority* v. *Eastern Kentucky Regional Planning Commission* (Ky, 1960), 332 SW2d 274; *Miller* v. *Police Jury of Washington Parish,* 226 La 8 (74 So 2d 394); *City of Frostburg* v. *Jenkins,* 215 Md 9 (136 A2d 852); *Albritton*

as having a public purpose. For example, in the Oklahoma case of *Harrison* v. *Claybrook* (1962), 372 P2d 602, 605, it is stated:

"That the particular function, or purpose, involved is a 'public' one cannot be seriously doubted. We think the court in *Faulconer* v. *City of Danville*, 313 Ky 468 (232 SW2d 80, 83), was particularly articulate on this subject when it said therein:

" 'The consensus of modern legislative and judicial thinking is to broaden the scope of activities which may be classed as involving a public purpose. * * * It reaches perhaps its broadest extent under the view that the economic welfare is one of the main concerns of the city, State, and the Federal governments.' "

Such cases, however, are of limited assistance. The question must be assessed in the light of our constitutional provisions and the history of our State.

---

v. *City of Winona*, 181 Miss 75 (178 So 799, 115 ALR 1436); *Opinion of the Justices*, 103 NH 258 (169 A2d 634); *Opinion of the Justices*, 103 NH 325 (171 A2d 429); *Roe* v. *Kervick*, 42 NJ 191 (199 A2d 834); *Village of Deming* v. *Hosdreg Company*, 62 NM 18 (303 P2d 920); *Gripentrog* v. *City of Wahpeton* (ND 1964), 126 NW2d 230; *Harrison* v. *Claybrook* (Okla, 1962), 372 P2d 602; *Opinion to the Governor*, 79 RI 305 (88 A2d 167); *cf. Opinion to the Governor*, 88 RI 202 (145 A2d 87); *Darnell* v. *County of Montgomery*, 202 Tenn 560 (308 SW2d 373); *McConnell* v. *City of Lebanon*, 203 Tenn 498 (314 SW2d 12); *Almond* v. *Day*, 197 Va 782 (91 SE2d 660); *State, ex rel. County Court of Marion County*, v. *Demus*, 148 W Va 398 (135 SE2d 352).

The minority view is represented by the following: *Beazley* v. *DeKalb County*, 210 Ga 41 (77 SE2d 740); *Hogue* v. *Port of Seattle*, 54 Wash 2d 799 (341 P2d 171); *Nash* v. *Town of Tarboro*, 227 NC 283 (42 SE2d 209); *Opinion of the Justices*, 152 Me 440 (131 A2d 904); *Opinion of the Justices to the Senate*, 332 Mass 769 (126 NE2d 795); *State, ex rel. Beck*, v. *City of York*, 164 Neb 223 (82 NW2d 269); *State, ex rel. Saxbe*, v. *Brand*, 176 Ohio St 44 (197 NE2d 328); *Village of Moyie Springs, Idaho*, v. *Aurora Manufacturing Company*, 82 Idaho 337 (353 P2d 767); *Village of Suring* v. *Suring State Bank*, 189 Wis 400 (207 NW 944); *State* v. *Town of North Miami* (Fla 1952), 59 So 2d 779; *State* v. *Suwannee County Development Authority* (Fla 1960), 122 So 2d 190; *State* v. *Clay County Development Authority* (Fla), 140 So 2d 576; but see *State* v. *Inter-American Center Authority* (Fla 1955), 84 So 2d 9; and *State* v. *Inter-American Center Authority* (Fla 1962), 143 So 2d 1.

Michigan cases have steadily broadened the concept of public purpose. In *Miller* v. *Michigan State Apple Commission,* 296 Mich 248, a State tax on apples, which was used to promote sale of Michigan apples, was upheld because stimulation of the State's apple industry would be beneficially reflected throughout the State. In *Hays* v. *City of Kalamazoo,* 316 Mich 443 (169 ALR 1218), the expenditure of general funds of a city for membership in the Michigan Municipal League, a private nonprofit corporation established to advise and lobby for cities and villages in the State, was upheld as being for a public purpose. In *Sommers* v. *City of Flint, supra,* a transfer of city property to the Federal government, without consideration, for use as an armory was upheld, based upon mutuality of obligation between the United States and the city in the field of national defense.

In determining what constitutes public purpose the following statement contained in *Allydonn Realty Corporation* v. *Holyoke Housing Authority,* 304 Mass 288, 292 (23 NE2d 665), is much quoted:

"Some of the factors which the cases suggest as proper to be considered are these: Whether the benefit is available on equal terms to the entire public in the locality affected; whether the service or commodity supplied is one needed by all or by a large number of the public; whether the enterprise bears directly and immediately, or only remotely and circumstantially, upon the public welfare; whether the need to be met in its nature requires united effort under unified control, or can be served as well by separate individual competition; whether private enterprise has in the past failed or succeeded in supplying the want or in eradicating the evil; whether, insofar as benefits accrue to individuals, the whole of society has an interest in having those individuals benefited; whether a proposed extension of governmental activity is in line with the historical

development of the Commonwealth and with the general purpose of its founders; whether it will be necessary to use public ways or to invoke the power of eminent domain; whether a special emergency exists, such as may be brought about by war or public calamity. It is hardly necessary to say that the foregoing considerations are in no sense to be regarded as exclusive of others, and that great weight or little or no weight may be attached to some of them according to the presence or absence of others, or of still other conditions not hereinbefore enumerated."

In *Hays* v. *City of Kalamazoo, supra,* pp 453, 454, this Court quoted with approval from 37 Am Jur, Municipal Corporations, § 120, p 734:

" 'A public use changes with changing conditions of society, new appliances in the sciences, and other changes brought about by an increase in population and by new modes of transportation and communication. The courts as a rule have attempted no judicial definition of a public as distinguished from a private purpose, but have left each case to be determined by its own peculiar circumstances. Generally, a public purpose has for its objective the promotion of the public health, safety, morals, general welfare, security, prosperity, and contentment of all the inhabitants or residents within the municipal corporation, the sovereign powers of which are used to promote such public purpose. The phrase "municipal purpose," used in the broader sense, is generally accepted as meaning public or governmental purpose as distinguished from private. The modern trend of decision is to expand and liberally construe the term "public use" in considering State and municipal activities sought to be brought within its meaning. The test of public use is not based upon the function or capacity in which or by which the use is furnished. The right of the public to receive and enjoy the benefit of the use determines whether the use is public or private.' "

It can scarcely be questioned that the benefits resulting from a plywood plant that are conjured by plaintiff would be general to the public in the Gaylord area, thereby meeting the test of public use set forth in *Hays* v. *City of Kalamazoo, supra.* The legislature, in enacting Act No 62, has concluded that the public health and welfare will be served. The act is constitutional as exhibiting a public purpose. In coming to this conclusion, we have taken particular note of the mandate of article 7, § 34, a new provision of the 1963 Constitution which states, in part, as follows:

"The provisions of this Constitution and law concerning counties, townships, cities, and villages shall be liberally construed in their favor."

## V.

Does Act No 62 of 1963 surrender or avoid the taxing power of the township of Bagley in which the plant will be located, contrary to the provisions of article 9, § 2, of the Michigan Constitution (1963), in that it does away with the lien for taxes against the industrial plant and site?

Act No 62 provides that the lessee will be subject to *ad valorem* property taxation, but that a lien will not attach to the property by virtue of that tax. Defendant contends that this violates article 9, § 2, of the Constitution of 1963, which provides:

"The power of taxation shall never be surrendered, suspended or contracted away."

A lien is not an essential element of the power of taxation. See Hellerstein, State and Local Taxation, pp 15–20 (1952). Unless a taxing statute expressly so provides, taxes do not constitute a lien on property. *Tousey* v. *Post,* 91 Mich 631, 634; 84 CJS, Taxation, § 585, p 1180.

Section 11 of Act No 62 parallels PA 1953, No 189, as amended (CLS 1961, §§ 211.181, 211.182 [Stat Ann 1960 Rev § 7.7(6) and Stat Ann 1965 Cum Supp § 7.7(5)]). The purpose in both instances is to insure that persons leasing normally tax-exempt property for profit-making purposes do not secure an unfair advantage by avoiding taxation. See *United States* v. *City of Detroit*, 345 Mich 601, 610; *Township of Muskegon* v. *Continental Motors Corporation*, 346 Mich 218, 223; and *Rockwell Spring & Axle Company* v. *Romulus Township*, 365 Mich 632, 637.

## VI.

Is Act No 62 of 1963 unconstitutional in that it does not contain a restriction on the power of the city of Gaylord granted therein to borrow money and contract debts, contrary to the provisions of article 7, § 21, of the Michigan Constitution (1963)?

Article 7, § 21, of the 1963 Constitution provides:

"The legislature shall provide by general laws for the incorporation of cities and villages. Such laws shall * * * restrict the powers of cities and villages to borrow money and contract debts."

Defendant contends that since Act No 62 does not contain a restriction on the power of the city to borrow it is invalid. The self-liquidating aspect of these bonds excepts them from the constitutional language. *In re Brewster Street Housing Site*, 291 Mich 313, 341, 342. For an extended discussion of this exception, see *Young* v. *City of Ann Arbor*, 267 Mich 241, 248–254. Because of the reasons expressed in *Young*, Act No 62 does not violate the debt restrictions of article 7, § 21.

## VII.

Is Act No 62 of 1963 deficient as ambiguous and incomplete because:

A. It does not provide that the bonds must be sold at public sale?

B. It permits a referendum on the question of the issuance of the bonds but provides no means for giving notice of the right of referendum?

## A.

Defendant's contentions here go to the provision in the municipal finance act for the public sale of mortgage revenue bonds issued by a municipality. CLS 1961, § 133.2 (Stat Ann 1958 Rev § 5.3188[7]). Act No 62 is silent with regard to the manner in which bonds are to be sold. However, section 9(2) of Act No 62 states that when issuing bonds a municipality may authorize additional bonds for contemplated future improvements and place them in escrow to be "negotiated" later.

The legislature may place restrictions on the manner in which bonds are to be sold. See 43 Am Jur, Public Securities and Obligations, § 126, p 373, and 15 McQuillin, Municipal Corporations (3d ed), § 43.65, p 589. The normal purpose of a public sale is to assure the best price, but here the city is unconcerned with price. Price is of concern only to the corporation.

Section 13 of Act No 62 specifically states that the municipal finance commission shall determine "whether the bonds conform to the provisions of *this act*." (Emphasis supplied.) While bonds under Act No 62 may not be issued without the approval of the municipal finance commission, they are not made subject to the provisions of the municipal finance act, only the provisions of Act No 62. That act does not require public sale. The legisla-

ture was free to make such a requirement or not. The act is not deficient in this regard.

## B.

Section 12 of Act No 62 provides for a right of referendum but makes no provision as to how notice should be given to the electors of that right. The legislature is not required to provide *any* right of referendum. Consequently, the act is not invalid for failure to particularize the method of notice. The city exercised its discretion in giving notice to the electorate. The council's action was published in the local newspaper. No petition for referendum was filed. No abuse of discretion is shown.

The referendum provision contained in the home-rule act (CLS 1961, § 117.5[g] [Stat Ann 1965 Cum Supp § 5.2084(g)]) is substantially different from that found in Act No 62. Only the referendum provision in Act No 62 is applicable to this proceeding.

## VIII.

Is the proposed bond issue in conflict with Act No 62 of 1963 or with applicable provisions of the city charter because:

A. The financing does not meet the requirements of the act in that:

(1) No provision is made for a depreciation account?

(2) Operation and maintenance expenses are to be met by the lessee rather than the city, with the result that excess funds for that purpose are to be returned to the lessee rather than credited to a depreciation account?

(3) The financing calls for the naming of a trustee although the industrial plant and site are not to be mortgaged?

B. The financing does not comply with provi-
sions of the Gaylord city charter in that:

(1) There will be no provision for competitive
construction bids as required by section 16.6 of the
city charter?

(2) The financing may contemplate the city's en-
gaging in a business enterprise requiring an invest-
ment of money in excess of 10 cents per capita but
without the approving vote of the electors of the
city thereon, as required by section 15.2 of the city
charter and section 5(e) of the city home-rule act?

(3) The financing may not comply with the terms
of sections 10.7 and 10.9 of the city charter relative
to the means of collection and payment of city
funds?

(4) The financing may cause the city to exceed
its debt limit as specified in section 12.7 of the city
charter?

## A.

(1) Section 3(c) of Act No 62 requires that the
agreement "provide    *   *   *   an *adequate* deprecia-
tion account."   CL 1948, § 125.1253 (Stat Ann 1965
Cum Supp § 5.3533[23]).   (Emphasis supplied.)
Plaintiff admits no depreciation account has been
created.   The rentals are programmed to amortize
the cost of the plant and site over 25 years.   The
corporation can then purchase the facility for $1.
Since the rentals will amortize the cost of the plant,
and the cost basis will be zero at the end of the lease,
this provides a built-in "depreciation account" which
is adequate.

(2) The fact that operation and maintenance ex-
penses are to be met by the lessee rather than the
city out of a segregated fund does not bring the
proposed bond issue in conflict with Act No 62.
Section 3(c) of Act No 62 does not require the es-
tablishment of a separate operation and mainte-
nance fund.   It states:

. "The agreement shall provide that the rents to be charged for the use of the industrial building shall be fixed and revised from time to time so as to produce income and revenues sufficient to provide for * * * the operation and maintenance of the industrial building."

Since the lessee will pay for operation and maintenance, the required provision has been met. Since the rentals do not include this cost, no money need be segregated in an operating and maintenance fund. Section 8(1) of Act No 62 does not require that sums accumulated in an operating and maintenance fund be transferred into the depreciation account, but provides that they "may" be transferred. These features of the proposed financing do not conflict with Act No 62.

(3) The proposed bond issue is not in conflict with Act No 62 although the issue calls for the naming of a trustee and does not provide for a mortgage on the facility. Section 5 of Act No 62 recognizes the alternative of either a mortgage or a trustee for the bondholders. CL 1948, § 125.1255 (Stat Ann 1965 Cum Supp § 5.3533 [25][1][e], [2], [3]). Further, that section is permissive and provides only that the resolution authorizing the bond issue "may [require] a mortgage or deed of trust" to secure principal and interest. The city council was not required to have the bond issue secured by a mortgage nor was it prohibited from providing for a trustee for the bondholders.

### B.

(1) The failure of the proposed financing agreement to make provision for competitive bids does not violate section 16.6 of the charter of the city of Gaylord. The plywood plant is now in existence.

Section 16.6 is silent as to the acquisition of an existing structure.   It provides:

"Before making any purchase or contract for *supplies, materials, equipment, or contractual services,* opportunity shall be given for competition." (Emphasis supplied.)

Section 3(a) of Act No 62 allows a municipality to acquire an industrial facility by "gift or purchase." Act No 62 controls.   *City of Hazel Park* v. *Municipal Finance Commission,* 317 Mich 582.

(2) Section 15.2 of the charter of the city of Gaylord requires that the city have a 3/5 approval of the electors before it engages in any business enterprise requiring an investment of money in excess of 10 cents per capita.   An identical requirement is found in CLS 1961, § 117.5(e) (Stat Ann 1965 Cum Supp § 5.2084[e]).   The city's function in this case is merely to furnish its name to a bond issue. Such function does not constitute engaging in a business enterprise.

(3) Section 10.7 of the city charter of Gaylord provides:

"All * * * other moneys regardless of source, accruing to the city shall be collected by the city clerk who shall in all cases give receipts therefor."

This provision is contradictory to section 5(1)(a) of Act No 62, which provides:

"Any resolution authorizing the issuance of bonds under this act may contain covenants as to * * * the use and disposition of the rentals from the industrial building."

Read as a whole, Act No 62 was intended to provide a particular means for the collection and payment of funds involved in industrial financing.   See, especially, section 3(c), which provides:

"Any municipality may * * * sell and convey the industrial building, including without limitation the sale and conveyance thereof subject to a mortgage."

Section 10.7 was designed for the normal fiscal activities of the city. To the extent that it is in conflict with the purposes of Act No 62, it is not applicable here.

Section 10.9 of the charter provides a precise method by which claims and demands against the city are to be met. This bond issue is self-liquidating. No "claims and demands" will arise from the proposed scheme of financing. Section 10.9 does not, therefore, invalidate the bond issue.

(4) Section 12.7 of the city charter of the city of Gaylord provides:

"The city may not incur indebtedness by the issue of bonds or otherwise, in any sum which * * * shall exceed 10 per centum of the assessed valuation of the real and personal property within the city."

This bond issue is in excess of the 10 percent limitation. The rationale which supports the exception noted in article 7, § 21, of the 1963 Michigan Constitution is applicable here. See *infra*. The indebtedness contemplated by section 12.7 is general obligation indebtedness and not self-liquidating indebtedness required by Act No 62.

## *Conclusion.*

Since the questions certified to this Court by the circuit court for the county of Otsego have been answered in favor of plaintiff, a writ of mandamus will issue to compel defendant to perform her duties.

No costs, a public question being involved.

## Addendum.

ADAMS, J. This addendum is written in reply to the opinion of Justice SOURIS in this case. On July 19, 1966, this Court convened for the purpose of hearing the response of counsel to the following communication from the clerk of the Court:

"Confirming my telephone conversation earlier today, please be advised that the Supreme Court has instructed me to request that you appear before the Court on Tuesday, July 19, at 11:30 a.m., prepared to discuss whether the following question ought to be certified and briefed.

"The question referred to is as follows: Should this proceeding be remanded to the trial court for supplementary certification of the questions designed to test the constitutional validity of PA 1963, No 62, against the limitations on legislative power contained in the 1908 Constitution, then still in effect?"

At the conclusion of the session, all counsel were asked whether, in their opinion, it was necessary that further questions be certified or further briefs be submitted. Counsel stated that further briefing was unnecessary and that the case could stand on the questions submitted.

This might be sufficient reason to decline to pass upon the questions raised by Justice SOURIS. There is, however, a more fundamental reason. The Michigan Constitution of 1963, art 3, § 7, under the heading "General Government", provides:

"The common law and the statute laws now in force, not repugnant to this constitution, shall remain in force until they expire by their own limitations, or are changed, amended or repealed."

The above provision has been shifted in the 1963 Constitution from its former position in the sched-

ules of previous Constitutions.[10]   Under Schedule
and Temporary Provisions, it is further provided:

"Sec. 1.   The attorney general shall recommend
to the legislature as soon as practicable such changes
as may be necessary to adapt existing laws to this
constitution."

No Michigan cases have considered the import
of article 3, § 7, or of the similar provisions of other
Michigan Constitutions.   In *Dewar* v. *People,* 40
Mich 401 (29 Am Rep 545), the city charter enacted
in 1873 empowered the common council to license
and regulate saloons, restaurants, and billiard
rooms.   At the time the charter was granted by
the legislature, the State Constitution provided that
the legislature should not pass any act authorizing
the grant of a license for the sale of intoxicating
liquors.   The constitutional provision was repealed
and the city then passed an ordinance that in effect
provided for licensing liquor establishments.   In
holding that the ordinance could not be sustained,
the Court said:

"The legislature of 1873 had no power, under the
Constitution as it then was, to authorize such li-
censes, and it is not presumable that any unconsti-
tutional power was intended to be exercised in grant-
ing the charter.   But if the charter at that time did

[10] Constitution of 1835.  Schedule.
"2. All laws now in force in the territory of Michigan, which are
not repugnant to this constitution, shall remain in force until they
expire by their own limitations, or be altered or repealed by the
legislature."
   The following also appears in article 1 of the Constitution of 1835.
"Sec. 21. All acts of the legislature contrary to this or any
other article of this Constitution shall be void."
   Constitution of 1850.  Schedule.
"Sec. 1. The common law and the statute laws now in force, not
repugnant to this constitution, shall remain in force until they expire
by their own limitations or are altered or repealed by the legislature."
   Constitution of 1908.  Schedule.
"Sec. 1. The common law and the statute laws now in force, not
repugnant to this constitution, shall remain in force until they
expire by their own limitations, or are altered or repealed."

not confer or attempt to confer the authority, neither does it do so now. The meaning of the charter is the same to-day that it was when adopted, and it cannot be affected and enlarged by any subsequent change in the Constitution. The intent to be sought for in the charter is the intent of the body which passed it, namely, the legislature of 1873; and that was clearly not an intent to authorize the licensing of sales of intoxicating drinks."

*Dewar* did not involve construction of the provision in the 1850 Michigan Constitution with regard to laws "in force" remaining in force. All *Dewar* decided was that the removal of a constitutional prohibition on the legislature did not have retroactive effect on previous legislative action so as to enlarge the legislative grant of authority beyond what the legislature had the power to do when it acted.

In *Village of Mt. Pleasant* v. *Vansice,* 43 Mich 361 (38 Am Rep 193), the defendant was fined for violation of a village ordinance forbidding the sale of liquor and providing that violations of the ordinance were misdemeanors. The Court said: (p 363)

"In the first place the general act referred to nowhere assumes to delegate the power to a village council to ordain misdemeanors."

The Court found (citing *Dewar*) that, since the legislature was forbidden to make laws authorizing the grant of a license at the time the incorporating act was passed, the legislature could not give that power to the village. The elimination from the Constitution of the prohibition did not change the meaning of the law from what it was at the time of enactment.

In *Dullam* v. *Willson,* 53 Mich 392 (51 Am Rep 128), it was held that a statute, purporting to give

the governor power to remove public officers for misconduct, void for repugnancy to the Constitution which had vested no judicial power in the governor, was not validated by an amendment to the Constitution giving him the power of removal. Justice CHAMPLIN wrote: (p 398)

"The information alleges that the removal was made in pursuance of the statute; and from the fact that the executive order removing the respondent follows the language of the statute instead of the Constitution, and fills the vacancy until the next session of the legislature, instead of the unexpired term, I am convinced that the action was had under the statute. But if the power exists under the Constitution, it is immaterial that a misrecital is made as to its source, and would not invalidate the exercise of the power. I am satisfied that the statute furnishes no valid basis for the power of removal, because repugnant to the Constitution of 1835, which vested no judicial power in the governor. The statute, being void, was not validated by the amendment of 1862, and *the question depends solely upon the constitutional amendment of 1862.*" (Emphasis supplied.)

Nothing was said in the amendment of 1862[11] with regard to its effect on prior laws nor did it purport in any way to validate a prior law.

*Seneca Mining Company* v. *Secretary of State,* 82 Mich 573 (9 LRA 770), involved passage by the legislature of PA 1889, No 129, authorizing the renewal of a corporate charter. An amendment to the Michigan Constitution passed at the 1889 April election eliminated a former limitation on the authority of the legislature to authorize such renewals. The Court said: (p 575)

"Without the authority conferred upon the legislature by this amendment to the Constitution, the legislature would have no authority to authorize the

---

[11] Amending Const 1850, art 12, § 8.—REPORTER.

extension of corporate existence of corporations such as this, as was held in *Attorney General* v. *Perkins,* 73 Mich 303. The important question which is therefore presented is, when did the amendment adopted by the electors in April, 1889, take effect as a part of the Constitution?"

The Court held the amendment took effect prior to the legislative enactment and, therefore, the renewal was authorized. Once again, the case does not involve the construction of the laws "in force" language of the Constitution but, rather, the construction of amendments to the Constitution.

In *People* v. *Frencavage,* 233 Mich 369, defendant had first been convicted in 1921 and sentenced to the Michigan reformatory. While out on parole, he was arrested on another offense and sentenced to Marquette prison. This conviction was vacated because of an invalid information. He was then brought back to Kent county under an 1861 law that had been declared unconstitutional. He was recommitted to the Michigan reformatory for his unexpired term under the first conviction. The Court said: (pp 371, 372)

"The portions of this legislation dealing with procedure were held to be unconstitutional in *People* v. *Moore,* 62 Mich 496. If these provisions were beyond the power of the legislature to enact at the time they were enacted, it is obvious that a change in the Constitution (PA 1903, p 452) did not make them valid without re-enactment."

An amendment to the 1850 Constitution in 1903 did not provide for validation of the 1861 act, but merely authorized procedures for retaking and returning convicts on parole. Since the 1861 act had been declared unconstitutional prior to adoption of the 1908 Constitution and was not validated by the 1903 amendment to the 1850 Constitution, it was

not "in force" when the 1908 Constitution was adopted.

*Toole* v. *State Board of Dentistry,* 300 Mich 180, involved an attack upon a law that had been submitted to a referendum vote. A constitutional provision required that the law be printed on the ballot. It was not so printed in machine precincts. The Constitution was later amended to allow a statute subject to referendum to be posted in the polling place rather than printed. The Court said: (p 184)

"This, of course, did not have retroactive effect, and the ballot prepared for use on the voting machines did not comply with the then command of the Constitution."

The Constitution required a certain procedure which was not followed. The amendment to the Constitution, adopted *after* the referendum, did not attempt to validate the procedure used at that election but, rather, authorized a new procedure. The election was tested by the procedure in effect when it was held.

It will be seen that, while the above cases deal with the effect of an amendment to the Constitution upon legislation, no case considered the effect of the laws "in force" provisions of any Michigan Constitution. Unfortunately, the constitutional debates are not helpful in construing the meaning of the laws "in force" provisions. However, if the language does not result in validating laws in effect at the time a new Constitution is adopted (save for those repugnant to it), each of Michigan's earlier Constitutions continues to have life and an effect upon the laws of this State even though the manifest intention of the authors of each Constitution was to replace the old with the new. The result would be that any law enacted under a previous Constitution would first have to be tested for constitutionality

under that Constitution, then under ensuing Constitutions, and finally under the 1963 Constitution. Under such a rule, a law might have to be reviewed for constitutionality under all four Michigan Constitutions before its validity is finally established.[12]

As somewhat indicative of the intention of the framers of the 1963 Constitution, it may be noted that the words "provided by law" or words to similar effect are used throughout the document and with much greater frequency than in earlier Constitutions. By way of example, the following parallel provisions are of interest:

| *1908* | *1963* |
|---|---|
| art 2, § 13. | art 1, § 14. |
| "The right of trial by jury shall remain, but shall be deemed to be waived in all civil cases unless demanded by one of the parties in such manner *as shall be prescribed by law.*" | "The right of trial by jury shall remain, but shall be waived in all civil cases unless demanded by one of the parties *in the manner prescribed by law.* In all civil cases tried by 12 jurors a verdict shall be received when 10 jurors agree." |
| art 5, § 39. | art 4, § 35. |
| "All laws enacted at any session of the legislature shall be published in book form within 60 days after the final adjournment of the session, and shall be distributed *in such manner as shall be provided by law.* The speedy publication of such judicial decisions as may be deemed | "All laws enacted at any session of the legislature shall be published in book form within 60 days after final adjournment of the session, and shall be distributed *in the manner provided by law.* The prompt publication of judicial decisions shall be provided by law. All laws and ju- |

---

[12] There were approximately 2,000 public acts in force when the 1963 Constitution went into effect. Many of those statutes contain numerous "portions." Under PA 1945, No 119 (CL 1948, § 8.5 [Stat Ann 1961 Rev § 2.216]), or under the severability provisions contained in many acts prior to the enactment of that act, the Court would be obliged to determine which portions of an act were invalid and which were not and whether the valid portions could be given effect after the invalid portions had been severed. The magnitude of this task can be judged from the fact that in 1948 there were 21,000 sections to the compiled laws. The number has, of course, since increased.

*1908*

expedient shall also be provided for by law. All laws and judicial decisions shall be free for publication by any person."

art 8, § 1.

"Each organized county shall be a body corporate, with such powers and immunities *as shall be established by law.* All suits and proceedings by or against a county shall be in the name thereof."

art 8, § 8.

*"The legislature may by general law* confer upon the boards of supervisors of the several counties such powers of a local, legislative and administrative character, not inconsistent with the provisions of this constitution, as it may deem proper."

art 9, § 8.

"Any officer elected by a county, city, village, township or school district may be removed from office in such manner and for such cause *as shall be prescribed by law.*"

*1963*

dicial decisions shall be free for publication by any person."

art 7, § 1.

"Each organized county shall be a body corporate with powers and immunities *provided by law.*"

art 7, § 8.

"Boards of supervisors shall have legislative, administrative and such other powers and duties *as provided by law.*"

art 7, § 33.

"Any elected officer of a political subdivision may be removed from office in the manner and for the causes *provided by law.*"

The change from the future tense in the 1908 Constitution to the present tense in the 1963 Constitution is of some significance.

The following cases from other States are helpful in determining the correct construction of the "in force" provision.

In *Henry* v. *State* (1871), 26 Ark 523, the State Constitution [1868] provided in article 15, § 16:

"All laws in this State not in conflict with this Constitution shall remain in full force until otherwise provided by the general assembly, or until they expire by their own limitation."

Defendants were indicted for keeping a grocery without a license. It was claimed that the former law regulating groceries was repealed by the new Constitution. The court rejected this proposition and said:

*"The laws continued in force by the Constitution itself, are as valid as though re-enacted by the general assembly."* (Emphasis supplied.)

*Golden* v. *People, ex rel. Baker,* 101 Colo 381 (74 P2d 715), involved a 1932 amendment to the Constitution which provided: "No such laws shall ever authorize the establishment or maintenance of any saloon." A 1935 act defined a so-called statutory "saloon", which went into existence all over the State. In 1936 an old age pension amendment was passed allocating to the pension fund 85% of taxes from intoxicating liquor "of whatever kind." The district attorney sought an injunction to prevent a town from issuing licenses on the theory that the 1935 act was unconstitutional. The court said, at p 384:

"Following the enactment by the general assembly of said chapter 142, licenses therein provided for, similar to those here in question, were issued and 'saloons,' if such they be, established thereunder have since been operating generally throughout the State. Thus the revenue raising provisions of said chapter 142 were incorporated into, and are now a part of, the Constitution, with the result that said article 22 has been modified as to its prohibition against the establishment and maintenance of any saloon, and those places here in question which had provided, and were providing, such revenue were legalized.

"To hold otherwise   *   *   *   seems clearly contrary to the purpose and intent of said amendment No. 4 and its specific language. *The fact, if it be a fact, that the licensing provisions of said chapter*

*142, here involved, were, prior to the passage of the old age pension amendment, unconstitutional, is now immaterial.* It had not been so declared and all presumptions were in its favor." (Emphasis supplied.)

*State, ex rel. Marr*, v. *Luther*, 56 Minn 156 (57 NW 464), involved railroad acts which were held to have been validated by an amendment to the Constitution. The court said: (pp 164, 165)

"In brief, the legislature assumed that when making a grant of lands to aid the building of a railway, or in executing the trust where lands had been granted to the State by congress for the same purpose (and which, while thus held by the State, either as proprietor or in trust, were, of course, not subject to taxation), it had the power, in the furtherance of the object for which the grant was made, to exempt such lands from ordinary taxation, and to provide for commuted taxation of both the railroad and the granted lands.

"There is not in the history of the State a single grant of lands to aid the building of a railway, where this system of commuted taxation has not been adopted.   *   *   *

"In this situation of things, the people adopted a constitutional amendment, Const, art 4, § 32a, ordaining that 'any law providing for the repeal or amendment of any law or laws heretofore or hereafter enacted which provides that any railroad company now existing in this State, or operating its road therein, or which may be hereafter organized shall in lieu of all other taxes   *   *   *   pay into the treasury of this State a certain percentage therein mentioned of the gross earnings of such railroad companies now existing or hereafter organized shall, before the same shall take effect and be in force, be submitted to a vote of the people of the State, and be adopted and ratified by a majority of the electors voting at the election at which the same shall be submitted to them.'

"This language must have been selected and this amendment *adopted with reference to the existing legislation* and the general legislative policy to which we have referred; and, read and construed in that light, it amounts to a clear recognition of the validity of existing laws providing for this commuted system of taxation of railroad property and lands, and of legislative power to enact such laws for the future. If it did not refer to this, there was nothing to which it could refer. *It is, by necessary implication, a validation of past legislation of that kind, and a grant of power to enact it in the future."* (Emphasis supplied.)

*People, ex rel. McClelland,* v. *Roberts* (1896), 148 NY 360 (42 NE 1082), involved the Constitution of 1876 which gave the superintendent of public works power to make certain appointments. The Constitution of 1894 put all government workers under civil service. The court held that the new Constitution enlarged the former civil service statute so that it covered all public employees and took away the power of the superintendent to make appointments. The court said, at pp 369, 370:

"Moreover, it is evident from the language of the new provision of the Constitution and from the debates in the convention which followed its introduction into that body, that it was framed and adopted with reference to existing laws, which were intended to give to it immediate practical operation. So that in adopting the new Constitution, the people, in their original capacity, decreed that, thereafter, all the departments of the government should be brought within the operation of existing laws on the subject of appointments. The mandate to the legislature to enact laws to provide for the enforcement of the section does not in any degree conflict with this view. That was a prudent and proper, though, perhaps, an unnecessary precaution. But it affords no ground for the inference that the people intended to ignore

the aid and utility of existing laws to give immediate practical effect to the principle, or that they were content to wait for the reform until the legislature should make new regulations on the subject. *It was the intention to put all the new provisions of the Constitution into operation through the instrumentality of such laws as were then in force, so far as practicable, and if, in practice, they were found to be in any respect insufficient for that purpose, they were to be replaced or supplemented by new ones. This view does not depend entirely upon construction, since the instrument itself contains an express provision on that subject. The people declared in section 16 of article 1 that 'Such acts of the legislature of this State as are now in force shall be and continue the law of this State,* subject to such alterations as the legislature shall make concerning the same; but all such parts of the common law, and such of the said acts, or parts thereof, as are repugnant to this Constitution, are hereby abrogated.'

*"If the act of 1883 or any of its amendments needed new life and vigor, in order to bring this case within their operation, it has thus been given to them by an authority from which even the legislature itself has derived all of its powers."* (Emphasis supplied.)

In the above case, it will be noted that the court not only held the law to be in force but also that the new Constitution had enlarged the former scope of the law.

See, also, *Speegle* v. *Joy* (1882), 60 Cal 278, holding that, under a constitutional "in force" provision, an act in force was kept in existence and that an act to go into effect at a future date was defeated. See, also, *People* v. *Whiting* (1883), 64 Cal 67 (28 P 445), where a portion of a statute in effect was held valid and a portion to have effect in the future was severed.

Of all the numerous State Constitutions containing provisions similar to Michigan's article 3, § 7,[13] as a matter of draftsmanship the provisions in the 1945 Georgia Constitution are of particular interest:

"Paragraph III.   Third in authority.—Third: In subordination to the foregoing: All laws now of force in this State, not inconsistent with this Constitution shall remain of force until the same are modified or repealed by the general assembly. *   *   *

"Paragraph IV.   Local and private acts.—Local and private acts passed for the benefit of counties, cities, towns, corporations and private persons, not inconsistent with the Supreme Law, nor with this Constitution and which have not expired nor been repealed, shall have the force of statute law, *subject to judicial decision as to their validity when passed,* and to any limitations imposed by their own terms." (Emphasis supplied.)    1 Georgia Code Ann, pp 666, 669.

The difference in the language of these two sections seems particularly pertinent since the last clearly spells out the rule for which Justice SOURIS contends.   Following one after the other, it must be inferred that the first does not.

The correct test of the constitutionality of a statute is not all previous Michigan Constitutions in effect from the time of a law's enactment plus the existing Constitution, but simply the validity of the law under the present Constitution.   This is the test that originally was set up in the Constitution of 1835, art 1, § 21, where it was provided:

"All acts of the legislature contrary to this or any other article of this Constitution shall be void."

---

13 See Index Digest of State Constitutions, pp 595, 596.

This provision was not repeated in later Michigan Constitutions. It is quite understandable why it was not because later Michigan Constitutions by their "in force" provisions carried over the statutory law that had been developing through the years under previous Constitutions and validated it save for repugnancy to the new Constitution.[14] It is noteworthy that all Michigan Constitutions retain in the laws in force provisions the exact words *"not repugnant to this Constitution."* Other phraseology has changed. This clause has remained throughout.

To adopt the contrary rule would produce results the people could not possibly have intended. In the present case, if we were to test PA 1963, No 62, under the 1908 Constitution and determine it to be unconstitutional, having already determined it to be constitutional under the 1963 Constitution, the legislature would be obliged again to pass the law. While the examination of the constitutionality of a law under two or more Michigan Constitutions might exercise the brain cells of the members of this Court, it would be an exercise the futility of which seems manifest. Enactment of legislation is a time-consuming and expensive process. If a law is valid under the 1963 Constitution, we cannot believe either the framers of the Constitution or the people intended that it be stricken from the statute books because of invalidity under some former Constitution which they have voted out of existence.

---

[14] The procedure of adopting a great body of law along with the adoption of a Constitution is a common one. For example: The 1835 Michigan Constitution carried into Michigan law the laws in force in the Territory of Michigan. Const 1835, schedule, § 2. The Kentucky Constitution carried into effect in Kentucky laws in force in Virginia as of June 1, 1792. Constitution of Kentucky, paragraph 233. The New Hampshire Constitution carried into State law the laws of the colony usually practiced in courts of law. Constitution of the State of New Hampshire, part 2, art 90.

We construe the language of the 1963 Michigan Constitution, art 3, § 7, to have validated all laws that were in force and effect on January 1, 1964. The constitutionality of said laws shall be tested by the 1963 Constitution save as to existing public and private rights as provided for by section 2 of the schedule and temporary provisions of that Constitution.

O'HARA, J., concurred with ADAMS, J.

T. M. KAVANAGH, C. J. (*concurring*). We concur in and support the reasoning and answers Justice ADAMS had written prior to the addendum portion of his opinion and we concur in the result reached.

We do not agree with the reasoning in his addendum, although we do agree it is not necessary for us to test PA 1963, No 62, under the 1908 Constitution.

The Michigan Constitution of 1963 was adopted April 1, 1963. The speaker of the house of representatives requested the opinion of the attorney general as to the constitutionality of the proposed Act No 62 under both the 1908 Constitution and the Constitution approved and adopted April 1, 1963.

On April 10, 1963, the attorney general of the State of Michigan gave his opinion approving the constitutionality of the act. On May 8, 1963, the legislature adopted Act No 62, effective immediately, which we are asked to construe.

A legislature has power to enact a statute not authorized by the present Constitution where the statute is passed in anticipation of a constitutional amendment authorizing it or provides that it shall take effect upon the adoption of such a constitutional amendment. See 16 Am Jur 2d, Constitutional Law § 180; 171 ALR 1075 and cases cited

therein, *Druggan* v. *Anderson,* 269 US 36 (46 S Ct 14, 70 L ed 151).

In *Druggan* v. *Anderson, supra,* the court was considering the Eighteenth Amendment to the United States Constitution, which was ratified and became effective January 16, 1919, but provided that prohibition therein declared should not become operative until after one year. The national prohibition act was passed after the ratification of the amendment, but before the expiration of the year, and provided that it was not to go into effect until after the amendment did. The court in upholding the act and holding that it went into effect January 16, 1920, made the incidental observation that "indeed it would be going far to say that while the fate of the amendment was uncertain Congress could not have passed a law in aid of it, conditioned upon the ratification taking place."

In *Alabam's Freight Co.* v. *Hunt,* 29 Ariz 419 (242 P 658), the contention was made that since, at the time of the passage of the act, the legislature had no power under the Constitution to require an election of remedies in advance of injury, it could not then enact a valid law containing such a provision, which should become effective upon a future amendment of the Constitution permitting it. The court in upholding the act said: "We are of the opinion that the legislature may pass an act to take effect only upon the adoption of a constitutional amendment authorizing it, and that its constitutionality is to be tested by the Constitution as it is at the time the law takes effect, and not as when it was passed."

The facts in the case before us, where the legislature by its request for the opinion of the attorney general after the 1963 Constitution was adopted by the people and before the enactment of the pro-

posed law, indicate the legislature was passing PA 1963, No 62, in anticipation of the effective date of the Constitution of 1963.

We conclude, therefore, that the act is not to be tested under the 1908 Constitution but under the 1963 Constitution.

DETHMERS, KELLY, and SMITH, JJ., concurred with KAVANAGH, C. J.

SOURIS, J. (*dissenting*). We are asked in this proceeding[1] to determine the constitutionality of the industrial development revenue bond act of 1963, PA 1963, No 62.[2] In addition, we are asked to pass upon the validity, under Act No 62 and other pertinent statutory provisions, of certain agreements proposed to be entered into between the city of Gaylord and the United States Plywood Corporation, a function usually performed, at least before execution of such agreements, by private attorneys engaged and paid for such professional service.

At stake in this proceeding is Michigan's effort to match other States' financial inducements to private industrial enterprises to locate new plants within their borders. The post-World War II dispersal of manufacturing establishments from the highly industrialized States, like Michigan, to those States which previously were predominantly agricultural, is unpleasantly familiar recent history in this State. So, too, are the techniques by which other States have sought to accelerate artificially that process of industrial decentralization. By Act No 62 our legislature apparently decided that Michi-

[1] This proceeding is unique in the history of the Supreme Court. It is the first instance in which the Court has been asked for its advisory opinion pending trial of questions of public law as permitted by GCR 1963, 797.

[2] CL 1948, § 125.1251 *et seq.* (Stat Ann 1965 Cum Supp § 5.3533 [21] *et seq.*).

gan should add to its arsenal of weapons for use in this competition among the States for industrial plants. The new weapon authorized by Act No 62 is the tax-exempt status, under section 103(a)(1) of the internal revenue code,[3] of interest on the obligations of a State and its political subdivisions.

What Act No 62 does, in its practical effect, is to authorize municipalities to grant favored private enterprises the benefit of this tax exemption for the purpose of financing their industrial development at costs less than the private financial market would charge. It works this way: If United States Plywood were considering erecting a plant at Gaylord, to be financed by traditional borrowing methods at prevailing interest rates, the private lenders would charge Plywood interest at a rate sufficiently high to reflect the fact that they, the lenders, would have to pay Federal income taxes on the interest received from Plywood on its borrowed indebtedness. If the private lenders were not obliged to pay Federal income tax on the interest earned from such loans, it is reasonable to conclude that they would charge a rate of interest lower than is charged when such tax is payable thereon and, consequently, the borrower's financing costs would be lower correspondingly. Act No 62 provides the means by which a municipality, like Gaylord, can reduce the borrowing costs of a favored industrial concern, like Plywood, by borrowing the money itself at lower interest rates than could Plywood, since receipt of interest income on Gaylord's obligations is tax free, and, in turn, by "loaning" that money to Plywood

---

[3] "§ 103.

(a) General rule.—Gross income does not include interest on—

(1) the obligations of a State, a Territory, or a possession of the United States, or any political subdivision of any of the foregoing, or of the District of Columbia." Internal Revenue Code of 1954 (26 USCA, § 103[a][1]).

at the same low rate of interest Gaylord itself must pay.

While the act does not expressly authorize a municipality to "loan" money to a private enterprise, the practical effect of what is authorized to be done is exactly that. Instead of simply loaning Plywood an amount in cash equal to Gaylord's borrowing, and at the same interest rate, for Plywood's use in constructing a plant near Gaylord, the act requires that Gaylord use the proceeds of its borrowing to acquire a plant site for lease or sale, or some combination of both, to Plywood at a rental or purchase price adequate, but no greater than necessary, to permit Gaylord to retire its indebtedness as principal and interest thereon become due. In this fashion the act avoids the appearance, at least, of State government's direct entry into the field of private industrial financing, *traditionally* regarded in this country to be beyond the permissible scope of State governmental powers.

The question then becomes, did the legislature have the *constitutional power* to authorize municipalities to enter into such transactions? The Court's decision, from which I dissent, is that it did. While my dissent is based upon technical deficiencies in this proceeding which, as I shall elaborate hereafter, preclude this Court from authoritative determination of the constitutionality of Act No 62, I regret that the majority's opinion does not consider the nature of the power granted municipalities beyond the superficial form in which it is cast by the act. The fact is that none of the parties, not even defendant, who denies the validity of the act, has included in the briefs filed in this Court any analysis of the act as an integrated whole. Instead, we are expected to pronounce a far-reaching constitutional judgment of an act the

essential nature of which is ignored by the parties
while its sections are described as if completely
independent one from the other, much as a blind
man would describe an elephant upon his first en-
counter with one by describing what he feels of its
trunk, its legs and its tail. Not infrequently appel-
late courts' judgment errors are attributable to just
such inadequacies of counsel's arguments and briefs.

## I.

### A.

I dissent from the Court's decision of the consti-
tutional issue simply because in my view the issue
has not been presented in its proper constitutional
context by either of the original parties in this case
nor by the attorney general, who intervened after
the case was at issue, technically, in the trial court.
My objection to determination of the constitution-
ality of Act No 62 is that all of the parties, and
the Court's majority, consider that issue exclusively
in the light of the limitations upon legislative and
municipal power contained in our Constitution of
1963, the provisions of which did not become effec-
tive until eight months following the legislative
adoption and gubernatorial approval of Act No 62,
which was ordered by the legislature to be given
immediate effect on May 8, 1963. It is my opinion
that the constitutional validity of Act No 62 must,
as a matter of uniform and manifestly correct judi-
cial practice, at least initially be judged by the
limitations contained in our Constitution of 1908,
the constitutional charter in effect when the legis-
lature undertook to adopt Act No 62.

There is no room to quibble over this principle
of law, our Court having stated and applied it,
without deviation, until now. It is so fundamental

and elementary a principle that rarely need it be expounded at length. In *Dewar* v. *People* (1879), 40 Mich 401 (29 Am Rep 545), Mr. Justice COOLEY writing for the Court, the Court set aside a conviction for keeping a saloon without a license, contrary to a city ordinance. The legislature had granted the city a charter with a provision authorizing it to license saloons, restaurants and billiard rooms or to prohibit any of them. When the charter was granted our Constitution of 1850 (art 4, § 47), forbade the legislature from authorizing the grant of licenses for the sale of intoxicating liquors, but that section was repealed by the people three years later. Following such repeal, the city enacted the ordinance which Dewar was charged to have violated, the sole authority for the ordinance being the city's charter provision mentioned above. Justice COOLEY concluded that, since the Constitution had forbade the legislature to authorize the grant of licenses for the sale of intoxicants when it had granted the city's charter, the charter's grant of authority to issue licenses could not be construed then, nor at the time of decision after repeal of the prohibitory constitutional provision, to permit licensing of sale of intoxicants. While it would have sufficed for purpose of decision to base his conclusion upon the finding that the legislature did not intend when it granted the charter to authorize the grant of licenses for the sale of intoxicants, Justice COOLEY also noted that the charter granted by the legislature was the same as it was when adopted "and it cannot be affected and enlarged by any subsequent change of the constitution." 40 Mich 401, 403.

In *Village of Mount Pleasant* v. *Vansice* (1880), 43 Mich 361 (38 Am Rep 193), a legislative act authorized villages to license "saloons, taverns and

eating-houses." As in *Dewar, supra,* this statute
was enacted while the 1850 Constitution contained
the provision forbidding the legislature to author-
ize the grant of licenses for the sale of intoxicants.
After repeal of that provision, the village adopted
an ordinance, ostensibly by authority of the statute
mentioned, requiring a license for the sale of in-
toxicants. Mr. Justice Graves, writing for the same
distinguished Court which decided *Dewar, supra,*
and which consisted of Justices Cooley, Campbell,
Marston and Graves, had the following to say in
application of the principle our majority refuses
to apply today (pp 363, 364):

> "If the legislature had the purpose to confer the
> power [to license sale of intoxicants], and designed
> that the terms used should have the meaning now
> claimed for them, the design was in conflict with
> the Constitution as it then existed, and the sense
> and scope of the provision were so far null and
> void. They never were of any force, and were as
> though they had not been expressed or involved
> in the language, and the words were left to carry
> a sense in harmony with the Constitution. The
> meaning claimed not having been enacted in the
> passage of the law, because the Constitution for-
> bade it, it has not become a law merely through a
> change of the Constitution and the lapse of time.
> *Dewar* v. *People,* 40 Mich 401; *Ludlow* v. *Hardy,* 38
> Mich 690."

In 1846, a statute of this State purported to au-
thorize the governor to remove certain State offi-
cers, for official misconduct or habitual or wilful
neglect of duty, during recesses of the legislature.
Acting pursuant to that statute, the governor re-
moved a trustee of a State institution and, as also
authorized by the statute, appointed a successor to
serve during the legislature's recess. Upon the
trustee's refusal to vacate his office, a quo warranto

suit was instituted in the Supreme Court in behalf of the successor appointee. This Court, in *Dullam* v. *Willson* (1884), 53 Mich 392 (51 Am Rep 128), entered judgment for the respondent trustee on the ground that the statute pursuant to which the governor purported to act was invalid because it violated the Constitution of 1835, in effect when the statute was enacted, notwithstanding that our Constitution of 1850, as amended in 1862, expressly authorized the governor to exercise the power of removal such as the legislature had purported to grant him in the statute of 1846. In rendering its decision, this Court said, at p 398:

"The statute furnishes no valid basis for the power of removal, because repugnant to the Constitution of 1835, which vested no judicial power in the governor. The statute, being void, was not validated by the amendment of 1862, and the question [the validity of the governor's summary removal of respondent] depends solely upon the constitutional amendment of 1862."

In *Seneca Mining Company* v. *Secretary of State* (1890), 82 Mich 573 (9 LRA 770), the Court considered and rejected the argument that a constitutional amendment adopted by the people in April of 1889 did not take effect immediately, but only at the commencement of the year 1890. The issue was important because in June of 1889, after the constitutional amendment had been approved by the people and pursuant to the power granted therein, the legislature enacted a statute authorizing certain mining companies, like plaintiff, to extend their corporate lives beyond 30 years. Upon plaintiff's attempt to extend its existence, and the secretary of state's refusal to file the required amended articles of association, plaintiff sought our writ of mandamus. The Court held that the constitu-

tional amendment became effective, that is, it attained the *force and effect* of law, in April of 1889 when adopted by the people and, therefore, that the legislature possessed the constitutional power to act as it did in June of that year. In rejecting the argument advanced by the secretary of state, the Court stated the fundamental proposition of law our majority rejects today in the following language:

"*For, if the law-making power is prohibited from enacting a law, and in disregard of such prohibition it goes through the forms of enacting a law, such enactment is of no more force or validity than a piece of blank paper, and is utterly void, and power subsequently conferred upon the legislature by an amendment of the Constitution does not have a retroactive effect, and give validity to such void law.*" 82 Mich 573, 576, 577. (Emphasis added.)

In *People* v. *Frencavage* (1925), 233 Mich 369, defendant challenged the validity of an 1861 legislative enactment relating to the revocation of conditional pardons. His theory was that the legislature did not have authority to enact such law prior to a 1902 amendment of the Constitution of 1850. The Court agreed by stating the obvious:

"If these provisions were beyond the power of the legislature to enact at the time they were enacted, it is obvious that a change in the Constitution (PA 1903, p 452) did not make them valid without reenactment." 233 Mich 369, 371, 372.

What these cases mean to me is that the legislature's acts must be judged in the light of the powers possessed by the legislature at the time it undertakes to act. With due regard for the fact that the legislative power of a State, unlike the legislative power of congress, does not depend upon ex-

press constitutional grant but, rather, is as broad and comprehensive as necessary to accomplish the legitimate purposes of government except as the people may have imposed restraints upon such power by constitutional limitations (*Sears* v. *Cottrell* [1858], 5 Mich 251, 257–259, and *Young* v. *City of Ann Arbor* [1934], 267 Mich 241, 243), the Constitution *in force and effect* at the time the legislature acts must be examined to determine whether the people in fact have forbidden the legislature so to act. If they have, the legislative act is a nullity, a void, a failure of creation; it is stillborn, dead at birth; it lacks the force of law; it is impotent as a source of rights or of obligations; it signifies an act of futility as devoid of effect as if never attempted; it is no more effective as a law than is a piece of blank paper.

This is not a principle of law unique to Michigan. All courts in other jurisdictions which squarely have considered the issue recognize the validity of the principle. See the cases cited and discussed in the annotation, "Remand or suspension of constitutional limitations as affecting statute previously enacted", 171 ALR 1070.

Like most other legal principles, this one has its limitations, but none is applicable here. When a legislature purports to enact a statute the subject matter of which is beyond the legislative power of the State as limited by the State's people in their Constitution, the principle is applicable and the statute is void *ab initio*. Thus it is that in this case the limitations upon legislative power contained in the 1908 Constitution should be examined to determine whether what the legislature attempted in Act No 62 to authorize municipalities to do was beyond the legislature's power. If it were beyond the powers of the legislature under the 1908 Constitution,

our judicial duty would end with our declaration of
the act's invalidity. Only if it were not beyond such
powers, would Act No 62 then have to be tested for
its current validity against the limitations contained
in the 1963 Constitution.

However, there are circumstances when courts
sometimes give legal effect to legislative acts which
violate constitutional provisions. For example, in
*Toole* v. *State Board of Dentistry* (1942), 300 Mich
180, this Court ruled that a referendum election
upon a statute regulating the practice of dentistry
effectively approved the statute notwithstanding
failure to comply with a then applicable constitu-
tional requirement that on referendum the full text
of the statute be printed on the ballot. While the
paper ballots used at the referendum election com-
plied with the constitutional requirement, the full
text of the statute was not printed on voting ma-
chine ballots. The Court's decision rested heavily
upon the overwhelming approval given the statute
by the electorate, and upon the fact that even with-
out the favorable votes cast on the voting machines,
the statute would have been approved by a very
substantial margin. Also articulated as a reason
for the Court's decision was the traditional reluc-
tance of courts to disfranchise voters for the mis-
takes of election officials. In my view of the *Toole
Case,* it must have been significant to the Court that
the legislative act challenged was, in practical effect,
an enactment by the people themselves. It is not
likely, in my opinion, that the Court would have
countenanced the legislature's failure to comply with
a like procedural requirement of the Constitution.
Judicial willingness to give legal effect to official
*actions* taken in violation of a constitutional pro-
vision, as distinguished from legislative enactments
beyond the scope of the legislature's power, arise

most frequently, as in the *Toole Case,* when elections are involved. For another example, see *Adsit* v. *Secretary of State* (1891) 84 Mich 420 (11 LRA 534).

There is another circumstance in which the void *ab initio* principle is not fully applicable. When a legislative enactment is unconstitutional as applied to certain parties or certain facts, but otherwise within the powers of the legislative body to enact, then the enactment generally is held to be void only when so applied and otherwise is given legal effect. See *Dequindre Development Co.* v. *Charter Township of Warren* (1960), 359 Mich 634, and *Schaefer* v. *City of East Detroit* (1960), 360 Mich 536. We need not pause long on this limitation upon the principle, for in this case of Gaylord, our inquiry should be whether the subject matter of Act No 62 was entirely beyond the constitutional capacity of the legislature and not whether the act as sought to be utilized in Gaylord contravenes constitutional limitations.

Finally, there is another exception to the principle, which exception is invoked, belatedly and inaptly, here. The exception is that the people themselves, by express constitutional enactment or by necessary implication therefrom, can validate a prior legislative enactment which exceeded the legislature's constitutional power. For a thoughtful discussion of this exception, see Field, The Effect of an Unconstitutional Statute (1935), pp 288–294. Its application depends upon the people's intent as expressed in the subsequent constitutional enactment. I have found no cases in which the courts have refused to apply the exception when the people's intent to validate a prior unconstitutional statute is stated clearly. The difficulty arises when the people's intent is not stated clearly.

It is now claimed that article 3, § 7 of the 1963 Constitution[4] signifies the people's intent to validate all prior unconstitutional statutes the provisions of which are not repugnant to the new Constitution and that, therefore, even if it be assumed that Act No 62 violated the 1908 Constitution, it now has the effect of law if it does not contravene the 1963 Constitution. This claim I will examine with some care later in this opinion. Suffice to note now that, while I recognize the exception to the general principle, in my opinion article 3, § 7 has nothing whatever to do with that exception.

Only in the event that the legislature had the constitutional power to do what it attempted in Act No 62, and that must be determined from the Constitution of 1908, will it become appropriate for us to consider, in that event, the continuing constitutional validity of Act No 62 under the Constitution of 1963. If we were to determine, on the other hand, that Act No 62 was beyond the power of the legislature to enact, as those powers were then limited by the Constitution of 1908, and thus invalid, the Constitution of 1963 cannot be construed to breathe life into an act theretofore dead. What the parties hereto would have us do, and our majority unwisely complies, is to skip the initial and crucial step of testing the constitutional validity of Act No 62 by the only constitutional instrument applicable at the moment of the act's purported creation—the Constitution of 1908. By this error of judgment to which our majority has been led, the legislature, our municipal governments, industrial concerns and bond buyers may be induced to rely upon our current majority's declaration of validity of Act No 62 only to discover, months or

---

[4] "Sec. 7. The common law and the statute laws now in force, not repugnant to this constitution, shall remain in force until they expire by their own limitations, or are changed, amended or repealed."

years hence when another suit challenges the act's validity when enacted, that their reliance was misplaced because our majority then might conclude that, indeed, our Constitution of 1908 forebade what the legislature sought to do in Act No 62.

After submission of this proceeding for our decision, when we discovered that none of the questions certified to us by the circuit judge and briefed by the parties[5] concerned the applicability of our Constitution of 1908 to the validity of Act No 62, a majority of my Brethren rejected my motion to remand the cause to the trial court for supplementation of the certified questions and the parties' briefs thereon to include questions concerning the validity of Act No 62 in light of the limitations upon legislative power contained in article 8, §§ 20 and 22 through 25, inclusive, and article 10, §§ 9, 12 through 14, inclusive, and 20 of the Constitution of 1908. Instead, the Court summoned counsel for the parties to appear before the Court on July 19 last to consider whether the cause should be remanded for such purpose.

At the hearing on July 19, counsel for the city argued that article 3, § 7 of the 1963 Constitution[6] had the effect of validating Act No 62 even if it were assumed *arguendo* that the act was violative of the

[5] Note, however, that prior to adoption of Act No 62, in response to a request from the Honorable Joseph J. Kowalski, the speaker of the house of representatives, the attorney general issued a formal opinion on April 10, 1963, in which he considered and upheld the constitutionality of the then pending legislation against the limitations contained then in article 10, §§ 12 and 14 of the Constitution of 1908 and, in addition, proceeded to give his opinion that the counterpart provisions of the adopted but not yet effective 1963 Constitution, article 9, § 18, and article 3, § 6, also would not be violated. See OAG 1963-1964, No 4146, pp 75-79.

[6] See footnote 4, p 336, *supra*. For similar provisions in our preceding constitutions, see Const 1908, sched, § 1; Const 1850, sched, § 1; and Const 1835, sched, § 2. The records of the proceedings of the constitutional conventions which adopted each of Michigan's four constitutions disclose that the delegates did not consider in debate the meaning now urged for the cited provisions.

1908 Constitution, his theory being, apparently, that not having been declared unconstitutional prior to the effective date of the 1963 Constitution, Act No 62 was a statute then "in force" and, therefore, it need now be tested against only the 1963 Constitution's limitations. He conceded he had no authority, from Michigan or any other jurisdiction with comparable constitutional provisions, to support his argument. The argument is not persuasive logically, for it assumes that a legislative act beyond the legislature's constitutional authority has sufficient vitality to be "in force" until judicially declared invalid. This simply is not true for an unconstitutional statute is invalid *ab initio,* a nullity from its inception, precisely because the legislature had no power to enact it. This Court put it trenchantly in *Adsit* v. *Secretary of State* (1891), 84 Mich 420, at 429, "An unconstitutional law is no law."

Article 3, § 7 is not unique to Michigan's Constitution of 1963. As noted in footnote 6, *supra,* comparable provisions have appeared in all three of our predecessor Constitutions and, as well, are found in the Constitutions of other States. Such a provision was involved in the decision of the Arkansas supreme court in *Henry* v. *State* (1871) 26 Ark 523. In that case defendants appealed a conviction for keeping a grocery without procuring a license and paying a tax therefor required by statute. One of their claims on appeal was that the power to license and tax a grocery-keeper did not exist when the statute was enacted; that such power was first granted the legislature by a new Constitution adopted subsequent to the statute; and, therefore, because the legislature failed to reenact the statute after adoption of the new Constitution, that the statute was void because beyond the legislative power at the time of its enactment. The Ar-

kansas supreme court made short shrift of the claim, noting that the legislature did, indeed, have the power to license grocers and to exact payment therefor, even before adoption of the new Constitution, since that power was not prohibited to the legislature by the prior Constitution. Since the statute was within the legislature's power and was, therefore, valid, the provision of the new Arkansas Constitution, similar to our article 3, § 7, would be applicable. That provided that all laws in force before the adoption of the Constitution and not in conflict with its terms, were to continue in force.

Such application of the constitutional language is eminently correct. It gives to the language no greater meaning than the average person, not encumbered by the labyrinthian complexities of the lawyer's thought processes, would give it. The language, as it surely was intended by the people whose votes adopted it, accomplished only the purpose of providing continuity of the *laws in force* under the old Constitution upon the adoption of a new Constitution so long as not in conflict with the latter. It is, after all, the judiciary's function in interpreting constitutional language to find the intent of the people who adopted it by their votes. See, for example, *Bacon* v. *Kent-Ottawa Metropolitan Water Authority* (1958), 354 Mich 159, 170, 171, and *Lockwood* v. *Commissioner of Revenue* (1959), 357 Mich 517, 554, 555.

Yet, today, it is baldly asserted that article 3, § 7 means much more than the Arkansas court said that State's counterpart provision meant, that it means that even statutes clearly void under the old Constitution are somehow given life if they could be enacted validly under the new Constitution—and without the need for any further legislative action whatever! And this bald assertion is made to this Court, not in the form of a written brief, but only

in oral argument, without so much as a passing
reference to what the people may have intended
in adopting article 3, § 7 and without so much as
a single citation of authority of any kind in support.

Who can argue, seriously, that the people in-
tended by article 3, § 7 to validate any and all void
statutes not repugnant to the 1963 Constitution?
There is not so much as a suggestion in the record
of the constitutional convention that the convention
delegates, even, so intended.  The argument may
appeal to desperate litigants and to Supreme Court
Justices intrigued by the practical advantages of
limiting their judicial tasks on assertion of invalid-
ity of time-matured statutes to scrutiny only of the
latest Constitution, but it has no such appeal for
me.  Absent some evidence that the people intended
such a strained meaning to be placed upon the
simple words of common usage with which they
spoke in their Constitution, it is not open to this
Court to distort by expansion what those words are
commonly understood to mean.

Mr. Justice Adams suggests in his opinion that
it "is of some significance" to our construction of
article 3, § 7, that the language used in article 1,
§ 14, article 4, § 35, article 7, §§ 1, 8 and 33 of the
1963 Constitution is cast in the present tense where-
as the future tense was used in the counterpart pro-
visions of the 1908 Constitution.  I must confess
that I do not comprehend the pertinence of this
suggestion.  Nor do I believe it is of any greater
significance than that the style and drafting com-
mittee of the constitutional convention succeeded
at least in part in performing its assigned and ex-
pressly limited[7] task of editing the language of
delegates' proposals without altering their substan-
tive meaning.  This is evident upon tracing the

---

[7] See 1 Constitutional Convention Record (1961), p 121.

cited provisions in the record of proceedings of the constitutional convention, from their reference as proposals to the style and drafting committee to that committee's submission of its redrafts to the convention. See, as to article 1, § 14, 2 Constitutional Convention Record (1961), pp 2925 and 3048; as to article 4, § 5, 1 Constitutional Convention Record (1961), p 707 and 2 Constitutional Convention Record (1961), p 2965; as to article 7, § 1, 1 Constitutional Convention Record (1961), p 985 and 2 Constitutional Convention Record (1961), p 2505; as to article 7, § 8, 1 Constitutional Convention Record (1961), p 986 and 2 Constitutional Convention Record (1961), p 2505; and as to article 7, § 33, 1 Constitutional Convention Record (1961), p 838 and 2 Constitutional Convention Record (1961), p 2971.

What I have written should not suggest that the people cannot do what it now is claimed they did in article 3, § 7. If the people desire to do so, other much more explicit language must be used so that their intent to validate statutes theretofore void because beyond the legislature's power be stated clearly. By new constitutional provision or amendment, the people can do directly what a legislature may have attempted to do beyond its own constitutional power, as in *Hammond* v. *Clark* (1911), 136 Ga 313 (71 SE 479, 38 LRA NS 77) and they can validate specifically identified statutes which otherwise would be void, as in the cases collected in part III of the annotation, referred to above, at 171 ALR 1070, 1072–1074. But neither of those techniques was attempted by the people to attain validity of Act No 62.

Justice ADAMS relies upon *State, ex rel. Marr,* v. *Luther* (1894), 56 Minn 156 (57 NW 464); *Golden* v. *People, ex rel. Baker,* (1937), 101 Colo 381 (74 P2d 715); and *People, ex rel. McClelland,* v. *Roberts*

(1896), 148 NY 360 (42 NE 1082), in aid of his construction of article 3, § 7. None of those cases involved a constitutional provision even remotely similar to our article 3, § 7. Instead, the cases of *Marr* and *Golden*, like *Hammond* v. *Clark, supra,* involved situations in which the Minnesota and Colorado courts found that the people intended, by constitutional amendments, to validate particular statutes theretofore enacted; and the case of *McClelland* involved simply a finding by the New York court that the people intended by specific language contained in a new Constitution to include all civil divisions within the State's civil service which theretofore had been established by statute but the coverage of which had been limited by provisions of the old Constitution.

The two California cases cited by Justice ADAMS, *Speegle* v. *Joy* (1882), 60 Cal 278, and *People, ex. rel. Orr,* v. *Whiting* (1883), 64 Cal 67 (28 P 445), do involve a provision of that state's constitution, effective January 1, 1880, similar to our article 3, § 7. However, they lend no support to Justice ADAMS' contentions. In both cases the California court held that such a constitutional provision did not give force and effect to statutes which were enacted prior to the new Constitution but which were not, by their terms, to become effective until "the first Monday of March, 1880". Those statutes, or parts thereof, not "in force" on the effective date of the new California Constitution, the court held, "never have and never will take effect". See *Orr, supra,* p 68. The claim presently asserted for our article 3, § 7, that it validates a statute beyond the legislature's power theretofor to enact, was not considered in *Speegle* nor in *Orr.* However, those cases do support my reading of article 3, § 7, to the extent that the California court held that California's counter-

part provision was a "saving" provision which carried over under the new Constitution only those previously enacted statutes which were validly in effect on the effective date of the new Constitution.

The assistant attorney general who appeared at the hearing on July 19th asserted, as did also the city's counsel, that the pertinent provisions of our 1908 Constitution were so similar to those in our 1963 Constitution that the arguments advanced in favor of the constitutionality of Act No 62 under the 1963 Constitution would be equally applicable under the 1908 Constitution. I will examine this assertion in due course later in this opinion.

Defendant's counsel, in addition, acknowledged the pertinence of an inquiry under the 1908 Constitution, but urged that we confine ourselves to a declaration of the act's invalidity under the 1963 Constitution. He candidly advised the Court that he would prefer such a limited determination of invalidity as a tactical matter because, if we were to declare the act invalid under the 1908 Constitution, it might yet be reenacted as an exercise of permissible legislative power under the 1963 Constitution, whereas if declared invalid under the 1963 Constitution, there would be no possibility of subsequent legislative reenactment absent a constitutional amendment. It will suffice to note that this Court cannot succumb to the tactical stratagems of litigants which artificially restrict the Court's performance of its duty when constitutional issues of public importance are involved.

Notwithstanding disclosure at the July 19th hearing that at least some members of the Court were deeply troubled by the failure of the trial court to certify questions raising the applicability of the 1908 Constitution and by the failure of all counsel to brief such clearly applicable questions, each coun-

sel present declined invitation to file supplementary briefs and elected to stand on the briefs already filed. Thus, without the benefit of a trial court decision, or even a trial, in this case of "public moment"; without the benefit of an appellate decision by our Court of Appeals; and without the usually beneficial assistance of counsel's briefs on constitutional issues of threshold importance, a majority of our Court proceeds nonetheless to render its advisory decision.

That prompt decision in this matter is important I do not doubt, but it is even more important that our decision, whenever made, be right. It cannot be a right decision when it leaves unanswered the threshold question upon which all other questions involved depend. Yet, that is precisely what the Court's majority proposes now to do.

Conceivably, any member of the Court who believes, as I do, that the 1908 Constitution's limitations first must be considered before decision herein, could proceed to such consideration and decision in dissent even without benefit of counsel's assistance. However, I am dissuaded from taking such course in this proceeding because the statute here involved is, beyond question, of major public significance. What is decided here will affect not only the Gaylord-United States Plywood project but others as well, some of which already have been undertaken and others of which are awaiting our present decision. In each of these projects, many interests are involved, both public and private; yet, it is strange that none of the municipalities or industrial concerns so vitally interested in the outcome of this litigation has sought to assist the Court in reaching its decision by participation herein as intervening parties or as *amicus curiae*. All factors considered, the validity of Act No 62, in my judg-

ment, should be determined only after the issues
have been narrowed by our traditional process of
adjudication in an adversary trial court proceeding
and then subjected to appellate review on a factual
record and with the assistance of complete appel-
late argument by skilled counsel.

It was this view I expressed first in my dissent to
our order of April 12, 1965, granting the governor's
request for certification of this case to the Supreme
Court prior to trial and decision by the circuit court.
That order and its three accompanying dissents
have not been published heretofore. Because I be-
lieve it important to the bench and bar that the
judicial record of this unique proceeding be avail-
able readily for future use, the Court's order and
the dissents thereto are printed in the margin in
their entirety.[8]

---

[8] "On order of the Court, the request of the governor under GCR
1963, 797, to certify the above case is GRANTED, subject to remand
to the circuit court of Otsego county in the event it appears upon
certification to this Court that the cause is not properly at issue
as to all parties litigant, or that further proceedings in the circuit
court are requisite for a complete record (Chief Justice KAVANAGH
and Justices BLACK and SOURIS dissenting).

"KAVANAGH, C. J., *dissenting.* I disagree with the order granting
certification in the above matter for the reason the pending circuit
court case is not in shape for certification to this Court; the attorney
general has filed no pleadings on behalf of the people of this State;
the taxpayers of Gaylord are not adversarily represented; and we
should not be expected to hear and decide cases in a vacuum. I would
deny the request of the governor until, and only until, the case is
in shape for certification to this Court.

"BLACK, J., *dissenting.* This pending Otsego county suit is not
yet in shape for certification under GCR 1963, 797. The attorney
general has filed no pleading and no proceedings have been taken to
insure that the people of Michigan as well as the taxpayers of
Gaylord are adversarily represented, as a class, under Court Rule
208. See *Connor* v. *Herrick,* 349 Mich 201, 204 *et seq.*

"I suggest—yes gratuitously—that the attorney general should
provide a team from his staff to brief and argue the constitutional
positions the defendant city clerk has taken plus any others such
team may wish to submit. That was done when the first constitu-
tional convention case was briefed and decided (*People* v. *State
Board of Canvassers,* 323 Mich 523); also when the sales-tax use-tax
case was briefed and argued (*Lockwood* v. *Commissioner of Revenue,*
357 Mich 517). It is a good way to assure that "friendly" lawsuits

Notwithstanding my disagreement with the Court's grant of certification herein, I would have proceeded to judgment, even in dissent, had the is-

---

like this do not become cozy unto a sellout of those who receive no true day in court.

"The impeding factor here is due to failure of the Constitutional Convention of 1961–1962 to insert, in the new Constitution, a Massachusetts type grant of constitutional authority for issuance of advisory opinions when requested by the chief executive or by the legislature.* Inclusion of such form of grant was, by at least one member of our Court, urged with considerable earnestness before the convention's committee upon the judicial branch.

"The Convention chose instead to insert the more restrictive provision which appears now as section 8 of article 3 of the Michigan Constitution of 1963.† That provision was not put to use in this instance. It could not have been, the legislature having given immediate effect to the act of 1963 (No 62) which, in this Gaylord Case, is up for judicial scrutiny.

"It is possible, the foregoing considered, that the circuit court record may yet be placed in shape for certification under GCR 1963, 797. Upon that thought I would deny certification without prejudice to future representations the governor may choose to forward pursuant to that rule.

"Souris, J., *dissenting*. I would deny the request made by the governor in his executive message to this Court dated March 15, 1965. Certification of controlling questions of public law involved in a pending case or controversy for decision by this Court prior to decision in the trial court, pursuant to GCR 1963, 797, is a matter for discretionary action by this Court pursuant to the express provisions of the Rule. In my judgment such discretionary action should be exercised, if ever, only in circumstances of extreme emergency in which, for example, the most vital functions of government are threatened or the public peace and safety are in jeopardy. I am not persuaded that City of Gaylord v. Gaylord City Clerk presents any such circumstance warranting our abandonment of our traditional judicial procedures by granting the certification requested.

"It is not normally the business of this Court to render advisory opinions in a context divorced from the adversary trial court pro-

---

* For at least a century the Massachusetts Constitution has provided as quoted below. True, the decisions in that State disclose that the provision is and has been employed with care, as well as sparingly. The point is that the provision is there, for use when needed. The provision:

"Each branch of the legislature, as well as the governor and council shall have authority to require the opinions of the justices of the supreme judicial court, upon important questions of law, and upon solemn occasions." (Massachusetts Constitution, art 2, chap 3).

† Opinions on constitutionality by Supreme Court.

"Sec. 8. Either house of the Legislature or the Governor may request the opinion of the Supreme Court on important questions of law upon solemn occasions as to the constitutionality of legislation after it has been enacted into law but before its effective date."

sues been framed and argued adequately for a worthy judgment of the statute's validity. They have not been to this date, and a majority of the Court has precluded the possibility of rectifying the fatal flaws in this record by its refusal to remand the cause to the circuit court for, at the very least, supplementary certification and briefing of the 1908 Constitution's applicability. To proceed to judgment in these circumstances is as futile as trying to fry an egg without first cracking and emptying its shell.

## B.

While some of the pertinent provisions of the 1908 Constitution have been carried over in the 1963 Constitution, others have not. Thus, even some of my Brethren who find no constitutional infirmity in Act No 62, the 1963 Constitution alone considered, might possibly conclude, upon consideration of such other provisions of the 1908 Constitution, that the act was invalid from its inception. It might help to compare the 1908 Constitution's provisions which I consider possibly relevant to our inquiry with the counterpart provisions, when there are such, of the 1963 Constitution:

| *1908* | *1963* |
|---|---|
| art 8, § 20.<br>"The legislature shall provide by a general law for the incorpo- | art 7, § 21.<br>"The legislature shall provide by general laws for the incorpora- |

ceedings traditional to the common law. Such function properly remains the duty of the attorney general when the State's interest is involved. Except in the rare circumstances mentioned above and when, upon solemn occasions, we may be requested, as provided in article 3, § 8 of the Constitution of 1963, by either house of the legislature or by the governor for our opinion upon the constitutionality of legislation enacted but not yet effective, I would decline respectfully all requests such as made herein to truncate the traditional judicial process experience throughout the centuries has proved best suited to the accomplishment of justice."

1908

ration of cities, and by a general law for the incorporation of villages; such general laws shall limit their rate of taxation for municipal purposes, and restrict their powers of borrowing money and contracting debts."

art 8, § 22.

"Any city or village may acquire, own, establish and maintain, either within or without its corporate limits, parks, boulevards, cemeteries, hospitals, almshouses and all works which involve the public health or safety."

art 8, § 23.

"Subject to the provisions of this constitution, any city or village may acquire, own and operate, either within or without its corporate limits, public utilities for supplying water, light, heat, power and transportation to the municipality and the inhabitants thereof; and may also sell and deliver heat, power and light without its corporate limits to an amount not to exceed 25 per cent of that furnished by it within the corporate limits, and may also sell and deliver water outside of its corporate limits in such amount as may be determined by the legislative body of the city or village; and may operate transportation lines without the municipality within such limits as

1963

tion of cities and villages. Such laws shall limit their rate of ad valorem property taxation for municipal purposes, and restrict the powers of cities and villages to borrow money and contract debts. Each city and village is granted power to levy other taxes for public purposes, subject to limitations and prohibitions provided by this constitution or by law."

art 4, § 51.

"The public health and general welfare of the people of the State are hereby declared to be matters of primary public concern. The legislature shall pass suitable laws for the protection and promotion of the public health."

art 7, § 23.

"Any city or village may acquire, own, establish and maintain, within or without its corporate limits, parks, boulevards, cemeteries, hospitals and all works which involve the public health or safety."

art 7, § 24.

"Subject to this constitution, any city or village may acquire, own or operate, within or without its corporate limits, public service facilities for supplying water, light, heat, power, sewage disposal and transportation to the municipality and the inhabitants thereof.

"Any city or village may sell and deliver heat, power or light without its corporate limits in an amount not exceeding 25 per cent of that furnished by it within the corporate limits, except as greater amounts may be permitted by law; may sell and deliver water and provide sewage disposal services outside of its corporate limits in such amount as

*1908*

may be prescribed by law: Provided, That the right to own or operate transportation facilities shall not extend to any city or village of less than 25,000 inhabitants."

art 8, § 24.

"When a city or village is authorized to acquire or operate any public utility, it may issue mortgage bonds therefor beyond the general limit of bonded indebtedness prescribed by law: Provided, That such mortgage bonds issued beyond the general limit of bonded indebtedness prescribed by law shall not impose any liability upon such city or village, but shall be secured only upon the property and revenues of such public utility, including a franchise stating the terms upon which, in case of foreclosure, the purchaser may operate the same, which franchise shall in no case extend for a longer period than 20 years from the date of the sale of such utility and franchise on foreclosure."

art 8, § 25.

"No city or village shall have power to abridge the right of elective franchise, to loan its credit, nor to assess, levy or collect any tax or assessment for other than a public purpose. Nor shall any city or village acquire any public utility or grant any public utility franchise which is not subject to revocation at the will of the city or village, unless such proposition shall have first received the affirmative vote of three-fifths of the electors of such city or village voting thereon at a regular or special municipal election; and upon such proposition women-taxpayers having the qualifications of male electors shall be entitled to vote."

*1963*

may be determined by the legislative body of the city or village; and may operate transportation lines outside the municipality within such limits as may be prescribed by law."

art 7, § 25.

"No city or village shall acquire any public utility furnishing light, heat or power, or grant any public utility franchise which is not subject to revocation at the will of the city or village, unless the proposition shall first have been approved by three-fifths of the electors voting thereon. No city or village may sell any public utility unless the proposition shall first have been approved by a majority of the electors voting thereon, or a greater number if the charter shall so provide."

1908

art 10, § 9.

"The power of taxation shall never be surrendered or suspended by any grant or contract to which the state or any municipal corporation shall be a party."

art 10, § 12.

"The credit of the State shall not be granted to, nor in aid of any person, association or corporation, public or private."

art 10, § 13.

"The State shall not subscribe to, nor be interested in the stock of any company, association or corporation."

art 10, § 14.

"The State shall not be a party to, nor be interested in, any work of internal improvement, nor en-

1963

art 9, § 2.

"The power of taxation shall never be surrendered, suspended or contracted away."

art 9, § 18.

"The credit of the State shall not be granted to, nor in aid of any person, association or corporation, public or private, except as authorized in this constitution.

"This section shall not be construed to prohibit the investment of public funds until needed for current requirements or the investment of funds accumulated to provide retirement or pension benefits for public officials and employees, as provided by law."

art 7, § 26.

"Except as otherwise provided in this constitution, no city or village shall have the power to loan its credit for any private purpose or, except as provided by law, for any public purpose."

art 9, § 19.

"The State shall not subscribe to, nor be interested in the stock of any company, association or corporation, except that funds accumulated to provide retirement or pension benefits for public officials and employees may be invested as provided by law; and endowment funds created for charitable or educational purposes may be invested as provided by law governing the investment of funds held in trust by trustees."

art 3, § 6.

"The State shall not be a party to, nor be financially interested in, any work of internal improve-

1908                                    1963

gage in carrying on any such         ment, nor engage in carrying on
work, except:                        any such work, except for public
   "1. In the development, im-       internal improvements provided
provement and control of or aid-     by law."
ing in the development, improve-
ment and control of public roads,
harbors of refuge, water-ways,
airways, airports, landing fields
and aeronautical facilities;
   "2. In the development, im-
provement and control of or aid-
ing in the development, improve-
ment and control of rivers,
streams, lakes and water levels,
for purposes of drainage, public
health, control of flood waters and
soil erosion;
   "3. In reforestation, protection
and improvement of lands in the
State of Michigan;
   "4. In the expenditure of
grants to the State of land or
other property."


   art 10, § 20.
   "It shall be competent for the
State to acquire, purchase, take,
hold and operate any railroad, or
railroad property, belonging to
any railroad or railway company
in this State heretofore organized
under a special charter still in
force and effect and constituting
a contract between the State and
said company, wherein the right
to purchase or acquire has been
reserved to the State, whenever
in the judgment of the legisla-
ture such acquisition or purchas-
ing is necessary to protect and
conserve the rights and interests
of the State under such charter
or contract. Any and all debts or
obligations of such company con-
stituting a lien upon such rail-
road, or railroad property, may
be assumed by the State; and
such road or property may be
leased, sold or disposed of in such
manner as may be provided by
law."

It has been claimed, by the city's counsel and the assistant attorney general at our July hearing, that so much of the language of the pertinent provisions of both Constitutions is identical or similar that a decision of the statute's validity under the 1963 Constitution virtually assures that the same conclusion would be reached under the 1908 Constitution. Of course, no such result automatically follows without our express pronouncement of such a decision; nor can we make such pronouncement in propriety without careful consideration of the differences in the pertinent provisions of the two Constitutions.

For example, is it not of some significance that whereas article 3, § 6 of the 1963 Constitution forbids the State from becoming "financially" interested in any work of internal improvement, article 10, § 14 of the 1908 Constitution forbade *any* interest in such improvements and not just financial interests therein?

And is it not of some significance that the 1963 Constitution limits the power of the State to grant its credit "except as authorized in this constitution" (art 9, § 18) and the power of a city or village to loan its credit "except as provided by law, for any public purpose" (art 7, § 26), whereas when Act No 62 was adopted the 1908 Constitution absolutely forbade the grant of the State's[9] credit "in aid of any person, association or corporation, public or private" (art 10, § 12)?

What about the express grant to cities and villages in article 8, § 24 of the 1908 Constitution (omitted in the 1963 Constitution) to issue "mort-

---

[9] Although reference was made only to the State's credit, the ban was held applicable, as well, to the political subdivisions of the State. See *Oakland County Drain Com'r* v. *City of Royal Oak* (1943), 306 Mich 124, 139, 140; and *Sommers* v. *City of Flint* (1959), 355 Mich 655, 663.

gage bonds" for the acquisition or operation of *public utilities* in amounts beyond the general limit of bonded indebtedness prescribed by law but, in which event, the city's or village's liability would be secured "only upon the property and revenues of such public utility"? Is this 1908 grant any different from the power to issue revenue bonds, authorized by Act No 62 but for other than public utility purposes? If the power to issue "mortgage bonds" or revenue bonds was limited, as it was by the 1908 Constitution, for the acquisition or operation of public utilities, may it not be argued that issuance of such bonds for other purposes logically was impliedly forbidden? *Expressio unius est exclusio alterius.*

Other examples of possibly significant differences between the two Constitutions can be readily discerned upon examination of the provisions from each set forth above. The examples mentioned should suffice to establish my contention that our majority's declaration of constitutionality under the 1963 Constitution does not address itself to the more difficult problems posed by the 1908 Constitution.

One reason the 1908 Constitution poses more difficult judicial problems than does the 1963 Constitution may be examined with profit. Our majority concludes that the 1963 Constitution's limited prohibition against the State's becoming interested ("financially") in works of internal improvements (art 3, § 6) does not apply to an interest financed by self-liquidating revenue bonds. This conclusion is based upon what is called by our majority "a recognized fact" by the delegates to the Constitutional Convention which produced our 1963 Constitution that such bond issues were not regarded by our Court to violate the internal improvements

provision of article 10, § 14 of our 1908 Constitution, citing *Gilbert* v. *City of Traverse City* (1934), 267 Mich 257; *Attorney General, ex rel. Eaves,* v. *State Bridge Commission* (1936), 277 Mich 373; *Oakland County Drain Com'r* v. *City of Royal Oak* (1943), 306 Mich 124; and *City of Dearborn* v. *Michigan Turnpike Authority* (1955), 344 Mich 37.

If we assume the delegates were aware of the cited decisions of this Court and that they believed our Court had held what the majority now says is the holding of those cases, then there is some merit in accepting the Court's construction of article 3, § 6 of the 1963 Constitution to exclude from its prohibitory reach projects financed by revenue bonds. However, as I will attempt later to demonstrate, I do not believe those cases can be read so broadly. Furthermore, if we were to apply the more restrictive limitation of article 10, § 14 of the 1908 Constitution, the pertinence of those decisions would be far different from their pertinence to our construction of the 1963 Constitution.

In the first place the delegates to the convention which drafted the 1908 Constitution were not influenced by the cited cases, each of which was decided long after that convention had completed its work. Thus, those cases could not be used to help determine what the delegates and the people then intended in adopting article 10, § 14 of the 1908 Constitution as our majority uses them to determine what was intended by article 3, § 6 of the 1963 Constitution.

In the second place, if we assume the cited cases mean what our majority today says they mean, we would not be precluded by *stare decisis,* or any doctrine or other principle of law, from overruling those post-1908 decisions insofar as our construction of the 1908 Constitution is involved. While I grant

we would be bound to accord the 1963 Constitution a meaning consistent with our own prior decisional rulings pertinent to the constitutional language to be construed, and even when convinced that such prior decisions were erroneous, the assumption being that the delegates and people in adopting such constitutional language relied upon those decisions, no such consideration would limit our power or our duty, as I see it, to reconsider the law declared in those decisions were we construing the 1908 Constitution.

That brings me now to the decisions themselves and the accuracy of our majority's claims for them. Our majority says that in those cases we held that self-liquidating bonds, revenue bonds, are not within the reach of the 1908 Constitution's prohibition against the State's becoming interested in works of internal improvement. *Gilbert* v. *City of Traverse City* (1934), 267 Mich 257, does not so hold. The case involved issuance of self-liquidating bonds by Traverse City to finance a municipal harbor and park development on Grand Traverse Bay. It was claimed that such a project violated article 10, § 14 of the 1908 Constitution because it was a work of internal improvement not among those then expressly authorized by the section. Contrary to our present majority's implication, the Court did *not* hold that such a project was not a work of internal improvement prohibited by the Constitution, nor did it hold, nor even infer, that works of internal improvement financed by self-liquidating bonds were beyond the reach of section 14's prohibition. Instead, and without further discussion, it held article 10, § 14 not applicable to the proposed project because "The project in question seems to be authorized by article 8, § 22, conferring upon cities the power to construct and maintain parks and other

works which involve the public health and safety." 267 Mich 257, 261.

Two years later, the Court decided *Attorney General, ex rel. Eaves,* v. *State Bridge Commission* (1936), 277 Mich 373. In that case the validity of PA 1935, No 147, was challenged. It was that act which authorized construction and operation of the Blue Water bridge between Port Huron and Sarnia and its partial financing by issuance of revenue bonds. Among the many claims made against the constitutionality of the act was the claim that it violated the prohibition against works of internal improvement contained in article 10, § 14 of the 1908 Constitution. Whereas in *Gilbert, supra,* as noted above, the Court planted its decision that the Traverse City project, financed also by revenue bonds, was not prohibited by article 10, § 14 because expressly authorized by article 8, § 22, in *Eaves,* the Court cryptically decided that Act No 147 did not contravene article 10, § 14 because "We held in *Gilbert* v. *City of Traverse City, supra,* that a self-liquidating project was not prohibited by the foregoing section of the Constitution." 277 Mich 373, 383. That this was *not* the rule of law of *Gilbert* is crystal clear, although it cannot be faulted as a description of the result in that particular case. Yet, in *Eaves* that cryptic description of result in *Gilbert* was misstated as the law of the case and summarily applied to *Eaves.* The *Eaves* decision on this point is troublesome for another reason. As in *Gilbert,* where the Court held that article 10, § 14 does not prohibit that which another provision of the Constitution expressly authorizes, so in *Eaves* the Court could have decided that case, consistent with *Gilbert,* by holding that article 10, § 14 did not prohibit the construction of the bridge, as an internal improvement, since article 8, § 26 of the 1908 Constitution,

previously quoted by the Court in *Eaves,* expressly authorized construction of bridges.

The Court's error in *Eaves* was compounded in *Oakland County Drain Com'r* v. *City of Royal Oak* (1943), 306 Mich 124, a case in which, among other things, it was claimed that a self-liquidating sewage disposal system was an internal improvement within the ban of article 10, § 14. After deciding, upon ample authority, that drains necessary for public health were not internal improvements of the kind prohibited by article 10, § 14, the Court gratuitously added, as *obiter dictum,* at p 142:

"Furthermore, the establishment and operation of the proposed sewage disposal system is hereinafter determined to be a self-liquidating project, and we have repeatedly held that such a project is not a work of internal improvement and, therefore, not prohibited by the constitutional provision above quoted. See *Attorney General, ex rel. Eaves,* v. *State Bridge Comm.,* 277 Mich 373; *Gilbert* v. *City of Traverse City,* 267 Mich 257."

Finally, in *City of Dearborn* v. *Michigan Turnpike Authority* (1955), 344 Mich 37, at pp 74, 75, the Court summarily rejected a claim that the turnpike act, PA 1953, No 176, was in conflict with article 10, § 14 of the 1908 Constitution because it authorized a public corporation to engage in works of internal improvement by simple reference to the above quoted dictum from *Oakland County Drain Com'r* v. *City of Royal Oak, supra.*

Those are the cases relied upon by today's majority, without analysis, to support a crucial portion of its decision under the 1963 Constitution. However immunized from judicial reconsideration those cases might be in construing the 1963 Constitution, and I do not concede this point yet, absent a much clearer showing of reliance thereon by the delegates

who drafted the Constitution than is made in the
majority's opinion, they are not immune from our
reconsideration if and when we consider the initial
validity of Act No 62 against the provisions of the
1908 Constitution which I believe were misconstrued
by the Court in the cited cases.

Enough has been said, I believe, even without
consideration of other pertinent provisions of the
1908 Constitution, to indicate the magnitude of the
error the Court commits today. It is twofold.
First, the case manifestly is not ready for decision,
the 1908 Constitution, clearly pertinent, having been
ignored, inexplicably, by all parties and the Court's
majority. Second, some of the cases relied upon by
the Court's majority, when carefully analyzed, do
not support the legal propositions for which they
are cited.

## II.

There is yet another reason I cannot join in the
Court's action today. While it may be argued
plausibly that this Court should decide, in these
truncated proceedings, the constitutionality of Act
No 62, its possible significance to the economic life
of our entire State considered, I can conceive of
no valid reason for consideration and advisory de-
cision now of the technical compliance of the pro-
posed agreements between Gaylord and United
States Plywood Corporation with the requirements
of the act and the city's charter. These questions,
also presented *in vacuo,* are perhaps significant
to the parties to the proposed agreements, but hardly
merit designation as questions "of such public mo-
ment as to require early determination" (GCR 1963,
797), before trial and decision by a circuit judge.
These are questions which bond counsel normally
is expected to pass upon in connection with every

bond issue and which courts ought not to be called upon to answer in advance as is here sought to be done. If answered in this case, on what basis shall we decline to give such advisory opinions in the future whenever a bond issue is proposed by any public body? See Mr. Justice BLACK's opinion in *Connor* v. *Herrick* (1957), 349 Mich 201, particularly his quotation, at 210, of Mr. Justice Brewer's opinion in *Tregea* v. *Modesto Irrigation District* (1896), 164 US 179, 185–187 (17 S Ct 52, 41 L ed 395).

## *Conclusion.*

I recognize the importance of our majority's decision to this State's position in the competition among the States for industrial development. However, PA 1963, No 62 represents a very substantial departure from our traditional concepts of the *constitutionally* appropriate scope of involvement of State and local governments in the affairs of private business. Valid judgment entitled to public reliance requires more from the Court than our majority submits today. The case is before us prematurely; the briefs of counsel and our majority's opinion do not address themselves to the constitutional issues of threshold importance; that opinion perpetuates past decisional error without comment; and, finally, our majority unwisely undertakes, in these truncated proceedings, to validate in advance a proposed bond issue by writing an opinion it should be bond counsel's obligation first to write. For the foregoing reasons I dissent from the Court's decision and, instead, would remand this cause for a complete testimonial hearing in the trial court.

BLACK, J. (*for entry of order indicated below*). Out of the titanic welter thus far written with respect to the questions certified to us, one unanimous

verdict is sure to spring from the critical ken of such lawyers and judges as are due to pore over these multifarious opinions. It is that this Court long since should have called for proceedings resulting in a further and better statement pursuant to GCR 1963, 797 (2). (See Appendix for this Rule.)

My vote accords with that verdict. It is cast in favor of an order directing necessary amendment of pleadings and for certification of additional questions aimed at test of PA 1963, No 62 by the Constitution of Michigan as same stood May 8, 1963.[1] The necessitous nature thereof appears pointedly in the opinion of Justice Souris, initial discoverer after submission here that the Court was confronted by an insufficient certification of questions.

I agree with Justice Souris that the validity of said Act No 62,[2] the act having been made declaredly effective on the above date, is due properly for primary test by such constitutional provisions as were in effect at the time. True, a secondary question could arise and well might be certified after the defendant's answer has been amended. To state it: In event Act No 62 survives any newly certified assay under the former Constitution, was that act nullified in whole or in part by some or any provision of the Constitution of 1963?

With all deserving deference I dissent from the sum of that which appears due—at present writing —for the unrestrictive indorsement of some if not an outright majority of the Brethren. Here it is, repeated for double exposure:

---

[1] This is not to suggest that a trial is requisite to solution of the issues posed by the pleadings and our said opinions. The controlling constitutional questions by their nature are readily certifiable and determinable without the taking of proof. They arise exclusively upon the compared faces of a statute and such constitutional provisions as are found applicable; not upon circumstances which require proof.

[2] *Nonfederal* validity, I would cautiously add.

"We construe the language of the 1963 Constitution art 3, § 7, to have validated all laws that were in force and effect on January 1, 1964."

Was Act No 62 "in force and effect on January 1, 1964"? Isn't it of due order that that question come to judicial answer prior to inquiry whether Act No 62 is "repugnant to this Constitution" (the current Constitution)?

Now I have always understood, and hear no lawyer or jurist contend otherwise, that an unconstitutional statute though in form and name a law is from the beginning no law at all; that the unconstitutionality thereof dates from the time of enactment rather than the time of decision so branding it, and that it at no time became effective for any purpose, legal or otherwise. Hence, according to my book of constitutional law at least, if Act No 62 was unconstitutional when enacted and ordered effective in May of 1963,[3] it can hardly be said—seriously at least—that said section 7 "validated" it seven months later.

To test the point assume that any statute enacted when the Constitution of 1908 was in effect (said Act No 62 included of course) had been questioned for validity under that Constitution with final judicial decision of unconstitutionality made prior to January 1, 1964. Assuming further that the tested statute is presently found "not repugnant to this Constitution," would said section 7 "validate" what prior to January 1, 1964, was invalid? My answer is that said section 7 operated January 1, 1964, and operates presently only upon the common law and "the statute laws now *in force,* not repugnant to this Constitution," and that it plainly has no legal or people-intended application to a statute unless that stat-

_____
[3] A question we cannot decide in the absence of additional certification or appeal following appropriate amendment of the defendant clerk's answer.

ute was *in force* when the new Constitution became operative.

Since the delay caused by this discovered omission of pleading and resultant error of certification is due partly to our own failure to scan these certified questions thoroughly when and shortly after they arrived last November, I would offer the following possibly helpful alternative suggestion, to which is appended a statement of conviction respecting Justice Adams' treatment of the now mooted merits.

The governor, having moved exigently pursuant to said GCR 1963, 797, could recommend that the legislature repeal said Act No 62 with immediately effective re-enactment thereof according to its tenor. Should that be done I could and would indorse unconditionally the reasons for answers and the answers Justice Adams has given to these certified questions. Which is to say that, had the statute now scrutinized come to enactment after January 1, 1964, my signature would support the reasoning and answers Justice Adams has written prior to the "Addendum" portion of his opinion.

Such a result would leave for future litigation any question of validity of said Act No 62 that might arise in any instance where—if at all—the act has already been utilized. It would at the same time relieve an intensely expectant situation of which we are all cognizant; a situation to which Justice Souris has made appropriate reference in his opinion. Unless it is unavoidable we should not make the fathers of quite a few of our cities hold their municipal breath much longer. In the phrasing of Mark Twain (Letter from the Recording Angel), we credit such men "up a thousand-fold" in our own great record, "on account of the strain," and now if at all feasible should effectively release that strain in some way, innovational or otherwise.

To avoid all possible misunderstanding my vote is cast in accordance with the second paragraph of this opinion.

## *APPENDIX.*

GCR 1963, 797, 373 Mich cxi, cxii.

Rule 797. Certified Questions.

(1) Whenever the judge or judges of any court, or the officers of any tribunal, from which an appeal of right or otherwise may be taken to the Court of Appeals or to the Supreme Court, has pending before him or them any controlling question or questions of public law involved in a pending case or controversy, and such question or questions are of such public moment as to require early determination according to executive message of the governor addressed to the Supreme Court, the Supreme Court in its discretion may authorize such judge or officers to certify such question or questions to the Supreme Court with a statement of the facts relevant thereto sufficient to make clear the application of such question or questions, and further proceedings relative to such case or controversy shall thereupon be stayed to such extent as the judge or officers shall by order direct, pending receipt of an answer from the Supreme Court.

(2) If any question is not properly stated, or if sufficient facts are not given to show the application thereof, the Supreme Court may require a further and better statement of the question and of the facts.

(3) The answers given by the Supreme Court to certified questions shall be given in the ordinary form of opinions, to be published with other opinions of the Supreme Court.

(4) After the answer of the Supreme Court has been transmitted to the court or tribunal from which

the question was certified, the case or controversy shall be proceeded with or disposed of in accordance therewith.